*Exhibit 40*

*Baird, "Medicare Expert Provides Insight on Aduhelm Coverage and Pricing Dynamics," July 1, 2021*

# Biotechnology

## Medicare Expert Provides Insight on Aduhelm Coverage and Pricing Dynamics

**KOL provides unique insight into outlook surrounding Medicare coverage of Aduhelm.** Last Thursday, we hosted a call with a KOL who has extensive knowledge surrounding Medicare coverage determinations and drug pricing to discuss the potential payer dynamics surrounding Biogen's Aduhelm. The KOL walked us through a number of potential avenues by which CMS could use the National Coverage Determination (NCD) framework, to restrict Medicare coverage of Aduhelm, though it is yet to be seen how restrictive CMS will ultimately decide to be.

- **Early launch likely unhindered by local contractors.** Early in launch, before CMS potentially undergoes the NCD process, local Medicare Administrative Contractors (MACs) are left to make their own determinations of coverage. Given the high degree of unmet need in Alzheimer's, the KOL does not expect these contractors will significantly hinder initial uptake of Aduhelm, until they are able to undergo their own review processes (which are only necessary if there is not an NCD).
- **CMS review to focus on whether Aduhelm is "reasonable and necessary."** It is important to keep in mind that CMS's mandate for determining coverage of Aduhelm focuses on whether or not the medication or treatment is “reasonable and necessary.” This differs from the FDA's approval mandate, which is focused on determining “reasonable assurance of safety and effectiveness for the drug or biologic." The distinction here is key, because if CMS determines through their review that treatment with Aduhelm is not reasonable and necessary, in the context of the clinical data in Alzheimer's disease, CMS could decide to implement significant coverage barriers.
- **Overview of CMS coverage determination process.** The KOL outlined the outlook with regard to CMS's process for determining an NCD. He noted in determining an NCD, CMS could call a Medicare Evidence Development & Coverage Advisory Committee (MEDCAC, outside expert panel) to discuss merits of Aduhelm. CMS could also contract a Health Technology Assessment (HTA) which is an evaluation that is done behind closed doors. The KOL noted that either or both of these evaluations could take place, but that if the MEDCAC is not utilized, it could serve as a signal that CMS wants to have additional control over the process and may foreshadow a favorable determination. After the aforementioned evaluation processes are complete, CMS drafts a NCD memo, then following a period for public comment, the final NCD is determined. All said and done, the process can take 1-2 years.
- **Comparable NCDs offer some insight.** While NCDs are often used for services, not therapeutics, the KOL described several comparable instances that offer some insight to a potential Aduhelm NCD. Notably, we would highlight the beta amyloid PET diagnostic NCD, which limited the coverage of Amyvid and similar diagnostics to clinical trials using the Coverage with Evidence Development (CED) status. While the diagnostic read through is nuanced, we expect that this decision will be revisited along with the Aduhelm review.

[ Please refer to Appendix - Important Disclosures and Analyst Certification ]

**Baird Biotech Research**
BairdBiotech@rwbaird.com

**Brian P. Skorney, CFA**
Sr. Research Analyst
bskorney@rwbaird.com
646.557.3204

**Jack K. Allen**
Research Associate
jkallen@rwbaird.com
646.557.3205

**Luke P. Herrmann**
Research Analyst
lherrmann@rwbaird.com
414.298.7544

This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

# Details

**Background of the key opinion leader.** The KOL is trained in law, and has numerous years of experience in the biopharma space. His experience focuses specifically on the drug pricing and coverage, including (but certainly not limited to) the process of achieving National Coverage Determination, and the negotiation of sub-340B prices, and analysis related to price reform.

**MACs unlikely to hinder early Aduhelm uptake.** In discussing the potential for local Medicare Administrative Contractors (MACs) to hinder the uptake of Aduhelm early on, before Aduhelm receives further judgement from CMS, the KOL noted his expectation that this would be highly unlikely. He noted that local contractor's primary role is not to question the decision making of individual prescribers, but rather to investigate areas of fraud. As such, we do not expect that local contractors would make any meaningful effort to limit Aduhelm prescriptions except in anomalous situations, given the significant breadth of the FDA labeling. We would also highlight that while the Natrecor case, discussed below, demonstrates a precedent for CMS to give local contractors power to limit uptake, this was only for off-label prescriptions. We believe there is no precedent for CMS to push responsibility to local contractors within the population of patients described under the respective label, so barring a major evolution in policy, we think it is most likely that local Medicare contractors will not be a key variable here. This is notable as, unless CMS completes its NCD process, the current system does not provide a strong barrier to Aduhelm reimbursement.

**Expect the NCD process will occur to determine Medicare coverage status.** A crucial question as to whether or not there may be coverage limitations imposed on Aduhelm is whether CMS will undergo the National Coverage Determination (NCD) process to determine whether Aduhelm will be covered by Medicare. While the KOL noted that this process is more often used for medical procedures than therapeutics, it has been used in the case of several other drugs under specific circumstances. Although CMS is not legally obligated to utilize this process, given the high degree of public interest and controversy from outside the typical Medicare ecosystem (such as professional physicians societies), he views it as very likely that the NCD process will take place to determine Medicare's coverage status of Aduhelm. As an additional point, he noted that while requests to utilize the NCD process can be externally generated, CMS may prefer to utilize an internally generated request.

**Specific techniques utilized during the NCD process may hint at outcome.** In conducting the NCD process, the CMS must complete a Health Technology Assessment (HTA), a Medicare Evidence Development & Coverage Advisory Committee (MEDCAC), or both, and these must take place no later than 9 months after the date the completed request is received. In comparing the two options, the KOL was of the opinion that the HTA review is far more lenient and would be more likely to reach similar conclusions of the FDA's label. In contrast, he noted his expectation that a MEDCAC meeting has far greater potential to lead to potential coverage restriction. In terms of which would actually occur, the KOL shared his expectation that there is a relatively high probability that if the NCD process occurs, that a MEDCAC meeting would be conducted, so that CMS would have a solid external source to rely on in enforcing its ultimate decision. Additionally, the KOL seemed to be of the opinion that the MEDCAC might reach a similar conclusion to the FDA advisory committee meeting, which clearly did not favor the benefit:risk profile of Aduhelm with a nearly unanimous negative vote. As such, we think that under the seemingly more probable scenario that a MEDCAC occurs, a highly critical review would also be more likely, potentially creating an environment where labeling restrictions occur. In an alternate scenario, given the expectation that a MEDCAC might not interpret the Aduhelm data positively, he noted that if the CMS does not wish to implement labeling restrictions on Aduhelm, it may choose to avoid conducting a MEDCAC meeting, given the potential negative optics of offering broad coverage against the opinion of its own panel of experts.

**Historical NCD's for therapeutics offer some insight.** The KOL did discuss several different instances where CMS utilized its national coverage determination (NCD) process for therapeutics/diagnostics,



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

though he emphasized that the Aduhelm scenario is quite unprecedented. We expect these comparisons (Amyvid, CAR-T's, others) offer a glimpse into how CMS utilizes the NCD process, though we would agree with the KOL that the unique nature of the Aduhelm situation means major readthroughs must be caveated to some extent. As an aside, we did put the KOL on the spot, asking him to speculate on the probability that Aduhelm could get a non-cover decision to conclude the NCD process. While he thinks it is unlikely that Aduhelm would not receive any coverage at all, given the breadth of the label, we believe the CED designation does lay some groundwork for a moderately to significantly limited degree of coverage.

- **Amyvid and other PET diagnostics.** Firstly, for Amyvid, Lilly's radioactive PET diagnostic for beta amyloid plaques, CMS's 2013 NCD decision strictly limited the patient populations where this diagnostic could be utilized with a Coverage with Evidence Development (CED) designation that allowed the drug only to be utilized in Medicare-approved clinical trials. This decision was made in part, as the KOL described, due to the lack of available therapeutic intervention following a positive diagnosis. We see two major takeaways here. Firstly, the current CED designation on Amyvid and now other PET diagnostics (Neuraceq, Vizamyl), is somewhat of a headwind to delivering Aduhelm to patients cost-effectively. Given Aduhelm technically represents a therapeutic intervention, the KOL suggested that CMS may choose to remove the CED designation surrounding beta amyloid diagnostics at some point, but until then, the WAC of these imaging agents is around $2,800, which would not be covered by Medicare. Secondly, the fact that CMS was willing to utilize the CED designation for an imaging agent, albeit under the reasoning that there was not currently a therapeutic intervention, does suggest that CMS is not unwilling to restrict access, even for an agent far less expensive than Aduhelm, using the CED mechanism. We can envision a scenario under which a MEDCAC advises CMS to place Aduhelm alongside the beta amyloid PETs under the CED designation, given the uncertainty about whether the drug is actually reasonable and effective as a treatment for Alzheimer's.

- **CAR-Ts.** For the CAR-Ts (Yescarta, Kymriah) our KOL described that the initial plan was to give these therapies a CED designation until available data evolved further, but ultimately under direction from the Trump administration, CMS did away with these plans and offered the autologous immunotherapies broad coverage. While these launches have been somewhat disappointing compared to expectations to date, we note that the manufacturing process and safety profile (though increasingly manageable) of these drugs were impactful negative factors early in these launches. We see the CAR-Ts as representing a more bullish comp for Aduhelm, as they demonstrate that even high cost therapeutics with limited data and safety concerns can achieve broad Medicare coverage. However, these drugs were approved on the basis of clinical efficacy data, which Aduhelm was not.

- **Natrecor and Provenge.** Shifting to Natrecor, the acute heart failure drug, we note the ultimate outcome of the NCD was giving local contractors power to limit uptake of the drug in the chronic heart failure setting. However, the drug was only labelled for acute heart disease, meaning there is only limited readthrough to Aduhelm, as the breadth of the Aduhelm label reduces the meaningfulness of potential off-label restrictions. Finally, regarding Provenge, we note the NCD decision for the autologous immunotherapy for prostate cancer was given on June 30, 2011, concluding the drug provided adequate evidence of health benefit for the labeled patient population here, the MACs were given power to judge coverage of off-label restrictions. Overall, the KOL did not have any significant readthroughs from these NCD processes to the potential Aduhelm NCD, and we would note that the precedent of off-label restrictions doesn't matter as much for a drug like Aduhelm, which received extremely broad FDA labeling.

**CMS does have several price-focused levers, but they are limited.** As we introduced briefly earlier, there are some other levers that CMS could utilize to restrict access to Aduhelm, but he believes none offer the same degree of control, in terms of limiting the ultimate impact of Aduhelm to the US healthcare system, that the NCD process could provide.

- **Medicare Advantage Plans.** In thinking about potentially using Medicare Advantage Plans as a way to control the impact of Aduhelm on the system, the KOL described the ability of Medicare Advantage Plans to negotiate prices with drugmakers. While this isn't a clear answer to access, he notes that CMS could find a way to incentivize more Medicare participants to utilize Advantage Plans (currently ~40%



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

of the broader Medicare population), as a way to reduce overall cost via price. We have already seen early examples of manufacturer price negotiation taking place, as Biogen management mentioned on the Aduhelm approval call that they intend to enter a value-based contract with Cigna, which our KOL presumed was related to Advantage Plans. The KOL does think this option is not foolproof though, notably given that Advantage Plans do not have a proven ability to actually reduce the overall healthcare costs for Medicare. As such, we view incentivizing Medicare participants to join Advantage Plans might be an auxiliary, but almost certainly not primary, method of reducing the potential systemic impact of Aduhelm uptake.

- **Public bulk purchase agreement would be a low probability wild-card.** The KOL noted that a potential bulk purchase agreement between Biogen and the US government, bypassing the traditional public payer setup, sounds mostly like a rumor, he did not completely rule out the possibility. We would generally concur with the KOL, though we note that given previous comments from President Biden, and HHS secretary Xavier Becerra also speculating on a deal, that there is some (limited) reasonable justification to this speculation.

**Political figures may favor attacks on price, not coverage restrictions.** While the potential for CMS to restrict access remains somewhat uncertain at this point, it is clear that political pressure on Biogen's intended Aduhelm pricing has already become apparent, something our KOL attributed to the improved optics of coming down on price (but not access). Though CMS does not have any legal power to directly consider the price of Aduhelm when making its coverage decisions, we do think support from congress on the pricing variable certainly gives CMS more leverage on the coverage side. It is unclear how the price/access updates will play off each other, but with HHS Secretary Xavier Becerra noting last week that "pretty heady decisions" might be made regarding the Aduhelm coverage, we don't see it as out of the realm of possibilities that Biogen could secure a bulk purchase agreement with the US government at a price per dose below the initial $56,000 listing, but for a large number of doses. With two house committees now investigating the approval and pricing of Aduhelm as well, we think all signs point to pricing reductions being the favored route for US lawmakers.



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

# Valuation & Risks



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

# Appendix - Important Disclosures and Analyst Certification

Approved on 30 June 2021 21:17EDT/ Published on 01 July 2021 01:05EDT.

**Appendix – Important Disclosures and Analyst Certification**
Robert W. Baird & Co. Incorporated ("Baird") and/or its affiliates expect to receive or intend to seek investment-banking related compensation from the company or companies mentioned in this report within the next three months. Baird may not be licensed to execute transactions in all foreign listed securities directly. Transactions in foreign listed securities may be prohibited for residents of the United States. Please contact a Baird representative for more information.
**Investment Ratings: Outperform (O)** - Expected to outperform on a total return, risk-adjusted basis the broader U.S. equity market over the next 12 months. **Neutral (N)** - Expected to perform in line with the broader U.S. equity market over the next 12 months. **Underperform (U)** - Expected to underperform on a total return, risk-adjusted basis the broader U.S. equity market over the next 12 months.
**Risk Ratings: L - Lower Risk** – Higher-quality companies for investors seeking capital appreciation or income with an emphasis on safety. Company characteristics may include: stable earnings, conservative balance sheets, and an established history of revenue and earnings. **A - Average Risk** – Growth situations for investors seeking capital appreciation with an emphasis on safety. Company characteristics may include: moderate volatility, modest balance-sheet leverage, and stable patterns of revenue and earnings. **H - Higher Risk** – Higher-growth situations appropriate for investors seeking capital appreciation with the acceptance of risk. Company characteristics may include: higher balance-sheet leverage, dynamic business environments, and higher levels of earnings and price volatility. **S - Speculative Risk** – High growth situations appropriate only for investors willing to accept a high degree of volatility and risk. Company characteristics may include: unpredictable earnings, small capitalization, aggressive growth strategies, rapidly changing market dynamics, high leverage, extreme price volatility and unknown competitive challenges.
**Valuation, Ratings and Risks.** The recommendation and price target contained within this report are based on a time horizon of 12 months but there is no guarantee the objective will be achieved within the specified time horizon. Price targets are determined by a subjective review of fundamental and/or quantitative factors of the issuer, its industry, and the security type. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, earnings multiples, peer group comparisons, and sum of the parts. Overall market risk, interest rate risk, and general economic risks impact all securities. Specific information regarding the price target and recommendation is provided in the text of our most recent research report.
**Distribution of Investment Ratings.** As of June 30, 2021, Baird U.S. Equity Research covered 730 companies, with 65% rated Outperform/Buy, 34% rated Neutral/Hold and 1% rated Underperform/Sell. Within these rating categories, 16% of Outperform/Buy-rated and 6% of Neutral/Hold-rated companies have compensated Baird for investment banking services in the past 12 months and/or Baird managed or co-managed a public offering of securities for these companies in the past 12 months.
**Analyst Compensation.** Research analyst compensation is based on: (1) the correlation between the research analyst's recommendations and stock price performance; (2) ratings and direct feedback from our investing clients, our institutional and retail sales force (as applicable) and from independent rating services; (3) the research analyst's productivity, including the quality of such analyst's research and such analyst's contribution to the growth and development of our overall research effort; (4) compliance with all of Baird's internal policies and procedures; and (5) other considerations, such as Baird's assessment of the prevailing market rates for talent in the sector the research analyst covers, but excluding the analyst's contributions to Baird's investment banking services activities. This compensation criteria and actual compensation is reviewed and approved on an annual basis by Baird's Research Oversight Committee. Analyst compensation is derived from all revenue sources of the firm, including revenues from investment banking. Baird does not compensate research analysts based on specific investment banking transactions.
A complete listing of all companies covered by Baird U.S. Equity Research and applicable research disclosures can be accessed at http://www.rwbaird.com/research-insights/research/coverage/third-party-research-disclosures.aspx. You can also call 800-792-2473 or write: Robert W. Baird & Co., Equity Research, 777 E. Wisconsin Avenue, Milwaukee, WI 53202.
**Analyst Certification**
The research analyst primarily responsible for the preparation of this research report certifies that the views expressed in this research report and/or financial model accurately reflect such research analyst's personal views about the subject securities or issuers and that no part of his or her compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in the research report.
**Disclaimers**
**Baird prohibits analysts from owning stock in companies they cover.**
This is not a complete analysis of every material fact regarding any company, industry or security. The opinions expressed here reflect our judgment at this date and are subject to change. The information has been obtained from sources we consider to be reliable, but we cannot guarantee the accuracy.
**ADDITIONAL INFORMATION ON COMPANIES MENTIONED HEREIN IS AVAILABLE UPON REQUEST**
The Dow Jones Industrial Average, S&P 500, S&P 400 and Russell 2000 are unmanaged common stock indices used to measure and report performance of various sectors of the stock market; direct investment in indices is not available. Baird is exempt from the requirement to hold an Australian financial services license. Baird is regulated by the United States Securities and Exchange Commission, FINRA, and



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

various other self-regulatory organizations and those laws and regulations may differ from Australian laws. This report has been prepared in accordance with the laws and regulations governing United States broker-dealers and not Australian laws.

**Other Disclosures**

The information and rating included in this report represent the research analyst's views based on a time horizon of 12 months, as described above, unless otherwise stated. In our standard company-specific research reports, the subject company may be designated as a "Fresh Pick", representing that the research analyst believes the company to be a high-conviction investment idea based on a subjective review of one or more fundamental or quantitative factors until an expiration date specified by the analyst but not to exceed nine months. The Fresh Pick designation and specified expiration date will be displayed in standard company-specific research reports on the company until the occurrence of the expiration date or such time as the analyst removes the Fresh Pick designation from the company in a subsequent, standard company-specific research report. The research analyst(s) named in this report may, at times and at the request of clients or their Baird representatives, provide particular investment perspectives or trading strategies based primarily on the analyst's understanding of the individual client's objectives. These perspectives or trading strategies generally are responsive to client inquiries and based on criteria the research analyst considers relevant to the client. As such, these perspectives and strategies may differ from the research analyst's views contained in this report.

Baird and/or its affiliates may provide to certain clients additional or research supplemental products or services, such as outlooks, commentaries and other detailed analyses, which focus on covered stocks, companies, industries or sectors. Not all clients who receive our standard company-specific research reports are eligible to receive these additional or supplemental products or services. Baird determines in its sole discretion the clients who will receive additional or supplemental products or services, in light of various factors including the size and scope of the client relationships. These additional or supplemental products or services may feature different analytical or research techniques and information than are contained in Baird's standard research reports. Any ratings and recommendations contained in such additional or research supplemental products are consistent with the research analyst's ratings and recommendations contained in more broadly disseminated standard research reports. Baird disseminates its research reports to all clients simultaneously by posting such reports to Baird's password-protected client portal, https://bol.rwbaird.com/Login("BairdOnline"). All clients may access BairdOnline and at any time. All clients are advised to check BairdOnline for Baird's most recent research reports. After research reports are posted to BairdOnline, such reports may be emailed to clients, based on, among other things, client interest, coverage, stock ownership and indicated email preferences, and electronically distributed to certain third-party research aggregators, who may make such reports available to entitled clients on password-protected, third-party websites. Not all research reports posted to BairdOnline will be emailed to clients or electronically distributed to such research aggregators. To request access to Baird Online, please visit https://bol.rwbaird.com/Login/RequestInstLogin or contact your Baird representative.

**Dividend Yield.** As used in this report, the term "dividend yield" refers, on a percentage basis, to the historical distributions made by the issuer relative to its current market price. Such distributions are not guaranteed, may be modified at the issuer's discretion, may exceed operating cash flow, subsidized by borrowed funds or include a return of investment principal.

**United Kingdom ("UK") disclosure requirements for the purpose of distributing this research into the UK and other countries for which Robert W. Baird Limited holds a MiFID passport.**

The contents of this report may contain an "investment recommendation", as defined by the Market Abuse Regulation EU No 596/2014 ("MAR"). This report does not contain a "personal recommendation" or "investment advice", as defined by the Market in Financial Instruments Directive 2014/65/EU ("MiFID"). Please therefore be aware of the important disclosures outlined below. Unless otherwise stated, this report was completed and first disseminated at the date and time provided on the timestamp of the report. If you would like further information on dissemination times, please contact us. The views contained in this report: (i) do not necessarily correspond to, and may differ from, the views of Robert W. Baird Limited or any other entity within the Baird Group, in particular Robert W. Baird & Co. Incorporated; and (ii) may differ from the views of another individual of Robert W. Baird Limited.

This material is distributed in the UK and the European Economic Area ("EEA") by Robert W. Baird Limited, which has an office at Finsbury Circus House, 15 Finsbury Circus, London EC2M 7EB and is authorized and regulated by the Financial Conduct Authority ("FCA") in the UK. For the purposes of the FCA requirements, this investment research report is classified as investment research and is objective. This material is only directed at and is only made available to persons in the EEA who would satisfy the criteria of being "Professional" investors under MiFID and to persons in the UK falling within Articles 19, 38, 47, and 49 of the Financial Services and Markets Act of 2000 (Financial Promotion) Order 2005 (all such persons being referred to as "relevant persons"). Accordingly, this document is intended only for persons regarded as investment professionals (or equivalent) and is not to be distributed to or passed onto any other person (such as persons who would be classified as Retail clients under MiFID).

All substantially material sources of the information contained in this report are disclosed. All sources of information in this report are reliable, but where there is any doubt as to reliability of a particular source, this is clearly indicated. There is no intention to update this report in future. Where, for any reason, an update is made, this will be made clear in writing on the research report. Such instances will be occasional only.

Please note that this report may provide views which differ from previous recommendations made by the same individual in respect of the same financial instrument or issuer in the last 12 months. Information and details regarding previous recommendations in relation to the financial instruments or issuer referred to in this report are available at https://baird.bluematrix.com/sellside/MAR.action.

Robert W. Baird Limited or one of its affiliates may at any time have a long or short position in the company or companies mentioned in this report. Where Robert W. Baird Limited or one of its affiliates holds a long or short position exceeding 0.5% of the total issued share capital of the issuer, this will be disclosed separately by your Robert W. Baird Limited representative upon request.



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.

Investment involves risk. The price of securities may fluctuate and past performance is not indicative of future results. Any recommendation contained in the research report does not have regard to the specific investment objectives, financial situation and the particular needs of any individuals. You are advised to exercise caution in relation to the research report. If you are in any doubt about any of the contents of this document, you should obtain independent professional advice.

Robert W. Baird Limited and Robert W. Baird & Co. Incorporated have in place organisational and administrative arrangements for the prevention, avoidance, and disclosure of conflicts of interest with respect to research recommendations. Robert W. Baird Limited's Conflicts of Interest Policy, available here, outlines the approach Robert W. Baird Limited takes in relation to conflicts of interest and includes detail as to its procedures in place to identify, manage and control conflicts of interest. Robert W. Baird Limited and or one of its affiliates may be party to an agreement with the issuer that is the subject of this report relating to the provision of services of investment firms. Robert W. Baird & Co. Incorporated's policies and procedures are designed to identify and effectively manage conflicts of interest related to the preparation and content of research reports and to promote objective and reliable research that reflects the truly held opinions of research analysts. Robert W. Baird & Co. Incorporated's research analysts certify on a quarterly basis that such research reports accurately reflect their personal views.

This material is strictly confidential to the recipient and not intended for persons in jurisdictions where the distribution or publication of this research report is not permitted under the applicable laws or regulations of such jurisdiction.

Robert W. Baird Limited is exempt from the requirement to hold an Australian financial services license and is regulated by the FCA under UK laws, which may differ from Australian laws. As such, this document has not been prepared in accordance with Australian laws.

**Copyright 2021 Robert W. Baird & Co. Incorporated**

This information is prepared for the use of Baird clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of Baird. Any unauthorized use or disclosure is prohibited. Receipt and review of this information constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained in this information (including any investment ratings, estimates or price targets) without first obtaining expressed permission from an authorized officer of Baird.

Ask the analyst a question

Click here to unsubscribe



This report is intended for michael.hencke@biogen.com. Unauthorized distribution prohibited.