*Exhibit 63*

*Guggenheim, "BIIB - With A Draft Proposal Memo Due From CMS on Jan 12th, We Caught Up With Our Payer Expert To Discuss Possible NCD Scenarios - CED Study Likely," January 10, 2022*

GUGGENHEIM

FLASH NOTE

January 10, 2022

**Yatin Suneja**
yatin.suneja@guggenheimpartners.com
212 518 9565

**Eddie Hickman, Ph.D.**
eddie.hickman@guggenheimpartners.com
212 518 9904

**Evan Taddeo, Ph.D.**
evan.taddeo@guggenheimpartners.com
212 518 9013

**BIIB** BUY

**Biogen Inc.**
**Sector: Biotechnology**

Company Update

| Share Price | $235.31 |
|---|---|

| **Financial Metrics** | |
|---|---|
| Cash (M) | 3,923 |
| **Market Data** | |
| 52-Week Range | $221.72 - $468.55 |
| Shares Out (M) | 146.9 |
| Market Cap (M) | $34,565 |
| ADV (3 mo; 000) | 1,357 |
| Long Term Debt (M) | $7,271 |




# BIIB — With A Draft Proposal Memo Due From CMS on Jan 12th, We Caught Up With Our Payer Expert To Discuss Possible NCD Scenarios - CED Study Likely

**Key Message:** Today, we hosted a follow-up conversation with our payer expert to understand the possible scenarios for the upcoming national coverage determination (NCD) process that CMS is currently conducting for BIIB's Aduhelm and other amyloid-targeting antibody therapies. Our expert outlined several potential outcomes for the draft memo due on Wednesday 1/12/22 and came to the conclusion that the ***most likely scenario is coverage with evidence development (CED)***, which will require further evaluation of Aduhelm to determine whether to cover the drug and if so, for which population of patients. While a limited coverage decision without the need for a study would be the best-case scenario for BIIB, our expert doesn't believe the real-world data are sufficient for CMS to determine a coverage framework without conducting a new study. Unfortunately for BIIB, being first to market here may have been a disadvantage as LLY (BLA on track for 1Q22) and RHHBY (depending on final clinical data and potential approval) may be able to skip a formal CED study and gain coverage before Aduhelm. We expect a decision memo draft on Jan 12, here.

*Last summer (7/12/21), the Centers for Medicare & Medicaid Service (CMS) announcedit is "initiating a national coverage determination (NCD) analysis for Monoclonal Antibodies Directed Against Amyloid for the Treatment of Alzheimer's Disease." An expert on payer dynamics had previously noted that Aduhelm was "ripe for an NCD" due to the controversial clinical and regulatory path that led to accelerated approval. To counter some of the public pressure the company received both politically and scientifically, BIIB recently (see HERE) lowered the WAC price of Aduhelm by ~50%, for a yearly cost per patient of $28,200 (down from $56,000). With the NCD draft date rapidly approaching, we caught up with our payer expert to discuss the possible outcomes for the NCD and how these scenarios would impact BIIB (and its amyloid competitors)*

**NCD timeline:**

- **July 12, 2021:** NCD review initiation
- **July 12 - August 10, 2021:** 30-day public comment period (comments are made public)
- **Jan 12, 2022:** Proposed Decision Memo Due Date (followed by another public comment period)
- **April 12, 2022:** Expected completion date. ***We note that this may change substantially or not at all from the draft memo in Jan.***
- **In months following:** If CED is proposed, we will likely get additional detail on the study design after the final draft. MEDCAC may also convene before or after the final decision to provide guidance on what a CED study should look like.

**Potential Scenarios**

**Scenario 1: "Final" decision by CMS comes in April that establishes specific criteria for reimbursing the cost of Aduhelm (either per label or some other set of restrictions) - 20% chance**

- Benefits: A blanket positive decision would benefit BIIB's Adu. According to our expert, it would create a ***general template for coverage and set boundaries (e.g., early stage patients, age, amyloid-positive via PET or CSF) on how and when patients are covered.*** A decision would be binding on MAC providers and Medicare Advantage plans who would follow the national CMS guidelines, a boon for BIIB who would have limited, but guaranteed coverage more permanently, without having to show additional real-world evidence in another study. This would be the **BEST CASE SCENARIO FOR BIIB (and for other competitors)** as it would almost immediately provide coverage and reimbursement for a subset of patients.


Provided for the exclusive use of Mike Hencke at Biogen Inc. on 11-Jan-2022 01:52 PM.

- Likelihood of occurrence (~20%): While possible, our KOL **does not think this scenario is likely to play** out because CMS prefers to see evidence that the product in question is having a positive impact on patients in the real world. Since the Aduhelm launch so far has been weak, and very few patients have been administered the drug, our expert doesn't see what real-world data CMS could point to in a memo to demonstrate evidence that the drug should be covered broadly.

**Scenario 2: Coverage with evidence development (CED) study to gather real world evidence on clinical efficacy of Aduhelm - 75% likelihood**

- What would a CED mean? According to our policy expert, coverage with evidence development (CED) is the likely outcome for the ongoing NCD. Given there is limited evidence that a reduction in the surrogate endpoint (amyloid plaque; the basis for FDA's accelerated approval) leads to clinical benefit (cognition), CMS will want to study the drug further to determine if and in what patients Aduhelm would be best suited to treat. A CED directed study could consist of a randomized controlled study (***rare for already approved drug***) or a patient registry and would enroll patients based on the criteria set forth by CMS. All patients enrolled in the study would get access Aduhelm (CMS will pay for the drug). If required, our expert believes the study ***could*** be conducted by the National Institute for Aging and supported by BIIB and Alzheimer's patient advocacy groups or similar agencies. ***There is no limit for how long a CED study needs to be, but our KOL believes 12-18 months is the minimum time required to show a potential impact on cognition - depending on the final size, the study could take longer.***
- Benefits: ***This scenario, which involves running a real world study*** (this would be separate from the confirmatory trial BIIB expects to complete this study in ~4 years), ***would be favorable for BIIB, according to our KOL, for three main reasons***: **(1)** the bar for success is low in a trial like this (no actual thresholds for efficacy). Adu will just need to show "some efficacy in some patients" to support a positive final NCD decision, **(2)** *100% of the cost is covered by CMS, including co-insurance, which could lead to thousands of patients getting access to Aduhelm depending on the enrollment criteria and final size,* and **(3)** enrolling a CED study would assist in getting more patients on Aduhelm in the N-T and perhaps establish a bit of positive traction in uptake that has been lacking since launch due to the lack of coverage and overall negative sentiment from neurologists. Once patients are on Aduhelm (per the CED), it might be hard for clinical neurologists to take them off drug, unless a serious safety issue emerges.
- Risks:
  - Usually, NCDs result in a favorable (may not be full) reimbursement, implying a decent sized addressable market for reimbursement. ***One potential risk is that in the event of CED, Adu would NOT be covered for anyone NOT enrolled in the trial.*** If the trial enrollment criteria are restrictive, it would severely limit the type of patient that could try Aduhelm, and since currently there are no other *currently* approved anti-amyloid antibodies, these patients would have no option to get Adu covered until a decision is made. Additionally, while we don't know the size of the study that would be required under a CED, it could limit the number of patients that could receive Aduhelm over a period of time. Of note, BIIB has recently noted that with insurance coverage, and with access to diagnostics and specialized centers, ~50K patients may start Aduhelm in 2022, which is less likely if a CED were to be initiated.
  - Another major risk for BIIB would be that other anti-amyloid therapies, while covered under this NCD, may not be required to take part in a CED study. If approved, those products would be evaluated similarly by CMS to determine if a CED is necessary or if coverage can be limited based on the available clinical data (e.g., if they show significant cognitive improvement or slowing of decline) without requiring further data. **This would end up putting Aduhelm at a significant disadvantage, despite being the first approved therapy in the class.** The other issue with CED is that it could overburden providers, causing some to opt out of offering Aduhelm treatment to Medicare patients (similar issue was at play during CAR-T NCD process). In fact, physicians could offer competing products (e.g., LLY's or Roche's Ab-therapies), if approved, as an alternative to Aduhelm.
- Likelihood of occurrence: ***Our KOL believes this scenario is more likely to occur given the lack of evidence for clinical benefit in AD with Adu***. CMS could view the CED process as a way to generate these real world efficacy data (which would actually help BIIB validate its drug and the amyloid hypothesis). ***In fact, our KOL expects that "tens of thousands to hundreds of thousands" of patients could enroll in the study, potentially generating robust data.*** We don't expect to know the final details of the CED at the time of the final decision in April (although it is possible we will get a general


Provided for the exclusive use of Mike Hencke at Biogen Inc. on 11-Jan-2022 01:52 PM.

framework) but our expert believes that those details will come within several months and may take into account feedback from the Medicare Evidence Development & Coverage Advisory (MEDCAC) who aid in guiding CMS in their design of CED studies.

- Of note, the chair of the MEDCAC committee recently commented publicly that he believes a CED should be conducted to study the drug in all Alzheimer's patients and "determine whether access to aducanumab generally slows Alzheimer's progression in a population. And if it does, whether that translates to financial and other benefits that could offset the drug's up-front expense." See HERE.

- **If CED trial begins, local coverage decisions (LCDs) are suspended temporarily.** If a CED trial is initiated, local coverage determinations are suspended and all patients will fall under the same NCD umbrella, which would eliminate these regional variations as any patient can enroll in the study to confirm efficacy (but not all will). Our expert noted that this trial is likely to have a restrictive patient inclusion criteria but will cover testing and drug for a significant number of Aduhelm-eligible patients. If there is a binding positive recommendation as part of the NCD (after the CED study), then local MACs must oblige by this decision. The primary goal of an NCD is to tame the "wild west" in terms of LCD variation. It is still up to local authorities to make up their own coverage protocols, but our KOL does not think plans will have 100% or 0% coverage, and until there is national guidance, plans will likely cover some, but not all, patients.

**Scenario 3: No coverage (i.e. MAC and MA plans make specific local coverage determinations) - <5% chance**

- Our expert believes a "no coverage" decision is unlikely, and we agree for several reasons: **(1)** it would severely handicap the other amyloid therapies currently in development that haven't had a chance to demonstrate any differentiation vs. Adu, **(2)** given there is a lack of real-world evidence on cognitive outcomes, there is also no evidence that there is no benefit to the therapy. Therefore, we think some framework for how to cover the drug is likely.

**What happens to other anti-amyloid products?**

- If a CED is required, our expert believes that when other products gain approval (e.g. LLY's donanemab, RHBBY's gantenerumab, and BIIB's lecanemab), CMS will evaluate them on the same criteria they laid out in the NCD. If they are able to show benefits, they may receive coverage for patients for whom the drug is expected to work without being required to conduct a CED study. While we note that drugs in this class that are approved based on a surrogate marker will all have the same potential issue and consideration by CMS as Aduhelm (does lowering plaque lead to improved cognition?), Aduhelm's clinical data and approval were controversial and newer products may be preferred simply because they avoided controversy.

**Our view on the NCD:** Net-net, we believe a CED is the likely outcome in April, but given full details on the guidelines for a CED study may not be fully known for several more months, which limits our outlook. For example, if a CED is initiated that is open to all AD patients, this would be a net positive for BIIB who haven't been able to get any patients on drug in the 6 months since approval. While there is always the risk that a CED study would lead to a final "no coverage" decision, we don't think this is likely and the drug will be covered for some patients in the long-term. Unfortunately for BIIB, being first to market here may have been a disadvantage as LLY and RHHBY (depending on final clinical data and potential approval) may be able to skip a formal CED and gain coverage before Aduhelm. We also note that positive/negative cognition data from the competing products (see below) could further complicate the situation.

### Key milestones in the space:

- Lilly (LLY) plans to file for accelerated approval for their mAb **donanemab** in **1Q22**, pending the availability of additional safety data.
- The TRAILBLAZER ALZ-4 study, a head-to-head study comparing **donanemab** vs. BIIB's Aduhelm, has top line data coming in **2H22**.
- Key confirmatory TRAILBLAZER ALZ-2 study data are expected by **mid-2023.**
- Data from Roche's **gantenerumab's** (subQ) GRADUATE program are coming in **2H22,** per the company.
- The Phase III CLARITY AD study of **lecanemab** is expected to read out during the **2H22**, per BIIB/Eisai (ESALY).
- A rolling submission for accelerated approval of **lecanemab** is ongoing and should to be completed in **1H22**.


Provided for the exclusive use of Mike Hencke at Biogen Inc. on 11-Jan-2022 01:52 PM.

## ANALYST CERTIFICATION

By issuing this research report, each Guggenheim Securities, LLC ("Guggenheim Securities") research analyst whose name appears in this report hereby certifies that (i) all of the views expressed in this report accurately reflect the research analyst's personal views about any and all of the subject securities or issuers discussed herein and (ii) no part of the research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst.

## IMPORTANT DISCLOSURES

The research analyst(s) whose name(s) appear(s) in this report have received compensation based upon various factors, including quality of research, investor client feedback, and Guggenheim Securities, LLC's overall revenue, which includes investment banking revenue.

Guggenheim Securities, LLC or its affiliates received compensation for investment banking services from Biogen Inc. during the past 12 months.

Guggenheim Securities, LLC or its affiliates expect(s) to receive or intend(s) to seek compensation for investment banking services from Biogen Inc. in the next 3 months.

Please refer to this website for company-specific disclosures referenced in this report: https://guggenheimsecurities.bluematrix.com/sellside/Disclosures.action. Disclosure information is also available from Compliance, 330 Madison Avenue, New York, NY 10017.

### Rating and Price Target History for: Biogen Inc. (BIIB) as of 01-07-2022




Created by: BlueMatrix

## RATINGS EXPLANATION AND GUIDELINES

**BUY (B)** - Describes stocks that we expect to provide a total return (price appreciation plus yield) of 10% or more within a 12-month period.

**NEUTRAL (N)** - Describes stocks that we expect to provide a total return (price appreciation plus yield) of between plus 10% and minus 10% within a 12-month period.

**SELL (S)** - Describes stocks that we expect to provide a total negative return (price appreciation plus yield) of 10% or more within a 12-month period.

**NR** - The investment rating and price target have been temporarily suspended. Such suspensions are in compliance with applicable regulations and/or Guggenheim Securities, LLC policies.

**CS** - Coverage Suspended. Guggenheim Securities, LLC has suspended coverage of this company.

**NC** - Not covered. Guggenheim Securities, LLC does not cover this company.

**Monitor -** Describes stocks whose company fundamentals and financials are being monitored, and for which no financial projections or opinions on the investment merits of the company are provided.

**Under Review (UR) -** Following the release of significant news from this company, the rating has been temporarily placed under review until sufficient information has been obtained and assessed by the analyst.

Guggenheim Securities, LLC methodology for assigning ratings may include the following: market capitalization, maturity, growth/value, volatility and expected total return over the next 12 months. The price targets are based on several methodologies, which may include, but are not restricted to, analyses of market risk, growth rate, revenue stream, discounted cash flow (DCF), EBITDA, EPS, cash flow (CF), free cash flow (FCF), EV/EBITDA, P/E, PE/growth, P/CF, P/FCF, premium (discount)/average group EV/EBITDA, premium (discount)/average group P/E, sum of the parts, net asset value, dividend returns, and return on equity (ROE) over the next 12 months.


Provided for the exclusive use of Mike Hencke at Biogen Inc. on 11-Jan-2022 01:52 PM.

Price targets are assigned for Buy- and Sell-rated stocks. Price targets for Neutral-rated stocks are provided at the discretion of the analyst.

**Equity Valuation and Risks**: For valuation methodology and risks associated with covered companies or price targets for covered companies, please see the most recent company-specific research report at https://guggenheimlibrary.bluematrix.com/client/library.jsp, contact the primary analyst or your Guggenheim Securities, LLC representative, or email GSResearchDisclosures@guggenheimpartners.com.

## RATINGS DISTRIBUTIONS FOR GUGGENHEIM SECURITIES:

| | | | IB Serv./ Past 12Mos. | |
|---|---|---|---|---|
| **Rating Category** | **Count** | **Percent** | **Count** | **Percent** |
| BUY | 245 | 66.58% | 72 | 29.39% |
| NEUTRAL | 116 | 31.52% | 10 | 8.62% |
| SELL | 7 | 1.90% | 0 | 0.00% |

## OTHER DISCLOSURES

This research is for our clients and prospective clients only. Other than disclosures relating to Guggenheim Securities and its affiliates, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the research analyst's judgement. Guggenheim Securities conducts a full-service, integrated investment banking and brokerage business, and one or more of its affiliates conducts an investment management business. Guggenheim Securities is a member of SIPC (http://www.sipc.org). Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and our employees trading for our own account that reflect opinions that are contrary to the opinions expressed in this research. Guggenheim Securities or certain of its affiliates conducts an investment management business, trades for its own account, and conducts an investment business, and may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

We and our affiliates, officers, directors, and employees, excluding equity and credit analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives, if any, referred to in this research. We and our affiliates also may sell to or buy from customers on a principal basis the securities described herein. We and our affiliates also do business with, or that relates to, companies covered in Guggenheim Securities' research, and may have a position in the debt of the company or companies discussed herein.

This research is not an offer to sell or the solicitation of an offer to buy any security. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

This communication does not constitute an offer of Shares to the public in the United Kingdom. No prospectus has been or will be approved in the United Kingdom in respect of the Securities. Consequently, this communication is directed only at (i) persons who are outside the United Kingdom or (ii) persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the “Order”), (iii) high net worth entities falling within Article 49(2) of the Order (iv) and other persons to whom it may lawfully be communicated (all such persons together being referred to as “relevant persons”). Any investment activity to which this communication relates will only be available to, and will only be engaged with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

Copyright © 2022 by Guggenheim Securities, LLC, ("Guggenheim") a FINRA registered broker-dealer. All rights reserved. The content of this report is based upon information obtained from sources that Guggenheim generally considers reliable, but Guggenheim makes no representations or warranties with respect to its accuracy, completeness, timeliness, suitability or otherwise, and assumes no responsibility to update it for subsequent events or knowledge. Guggenheim is not responsible for your use of this information.


*See pages 4 - 5 for analyst certification and important disclosures.*

Provided for the exclusive use of Mike Hencke at Biogen Inc. on 11-Jan-2022 01:52 PM.

# Guggenheim Securities Equity Research & Equities Teams

## Consumer Equity Research

### Automotive
**Ali Faghri** 310.319.2562
Ali.Faghri@guggenheimpartners.com

### Beverages & Food Producers
**Laurent Grandet** 212.372.6368
Laurent.Grandet@guggenheimpartners.com

### Consumer Internet/E-Commerce
**Seth Sigman** 212.518.5337
Seth.Sigman@guggenheimpartners.com

### Food Retailers; Consumables Retail/Distribution
**John Heinbockel** 212.381.4135
John.Heinbockel@guggenheimpartners.com

### Hardlines Retail
**Steven Forbes, CFA, CPA** 212.381.4188
Steven.Forbes@guggenheimpartners.com

### Restaurants
**Gregory Francfort, CFA** 212.518.9182
Gregory.Francfort@guggenheimpartners.com

### Retailing/Department Stores & Specialty Softlines
**Robert Drbul** 212.823.6558
Robert.Drbul@guggenheimpartners.com

## Consumer Equities Team

### Consumer Sector Specialist
**Carey Kaufman** 504.299.3424
Carey.Kaufman@guggenheimpartners.com

## Energy & Power Equity Research

### Energy Technology & Industrial Technology
**Joseph Osha, CFA** 415.852.6468
Joseph.Osha@guggenheimpartners.com

### Power & Utilities
**Shahriar Pourreza, CFA** 212.518.5862
Shahriar.Pourreza@guggenheimpartners.com

## Technology & Media Equity Research

### Entertainment & Digital Media
**Michael Morris, CFA** 804.253.8025
Michael.Morris@guggenheimpartners.com

### Media & Live Entertainment
**Curry Baker** 804.253.8029
Curry.Baker@guggenheimpartners.com

### Security & Infrastructure Software; Communication & Collaboration Software
**Imtiaz Koujalgi** 212.518.9398
Imtiaz.Koujalgi@guggenheimpartners.com

### Software
**Ken Wong, CFA** 415.852.6465
Ken.Wong@guggenheimpartners.com

## Healthcare Equity Research

### Biotechnology
**Debjit Chattopadhyay, Ph.D.** 212.823.6584
Debjit.Chattopadhyay@guggenheimpartners.com

**Michael Schmidt, Ph.D.** 617.859.4636
Michael.Schmidt@guggenheimpartners.com

**Yatin Suneja** 212.518.9565
Yatin.Suneja@guggenheimpartners.com

**Charles Zhu, Ph.D.** 212.518.9501
Charles.Zhu@guggenheimpartners.com

### Global Biopharmaceuticals
**Seamus Fernandez** 617.859.4637
Seamus.Fernandez@guggenheimpartners.com

### Medical Supplies & Devices
**Chris Pasquale** 212.518.9420
Chris.Pasquale@guggenheimpartners.com

## Healthcare Equities Team

### Healthcare Sector Specialist
**Whitney Wolfe** 212.518.9630
Whitney.Wolfe@guggenheimpartners.com

### Senior Consultant, Guggenheim Securities
### CEO, Health Capital Group, LLC
**Neal Masia**
GSPolicyPulse@guggenheimpartners.com

## Sales and Trading Offices

| | |
|---|---|
| New York | 212.292.4700 |
| San Francisco | 415.852.6451 |
| Boston | 617.859.4626 |
| Los Angeles | 310.260.6832 |
| Richmond | 804.253.8052 |


Provided for the exclusive use of Mike Hencke at Biogen Inc. on 11-Jan-2022 01:52 PM.