UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
OKLAHOMA FIREFIGHTERS PENSION    )
AND RETIREMENT SYSTEM,           )
                                )
             Plaintiff,          )
                                )
        v.                       )     CIVIL ACTION
                                )     NO. 22-10200-WGY
BIOGEN INC., MICHEL VOUNATSOS,   )
and ALISHA ALAIMO,               )
                                )
             Defendants.         )
_____ )
```

YOUNG, D.J.                              February 4, 2025

## REPORT and ORDER

*Have the courage of your own error.*[1]

~ Hon. Vincent Brogna, Justice, Massachusetts Superior Court (1978).

## I.    INTRODUCTION AND RELEVANT PROCEEDINGS

This is a securities class action lawsuit brought by shareholders who allege that they were harmed by a series of misrepresentations made by Biogen, Inc. and its executives (collectively, "Biogen") during the rollout of Biogen's

---

[1] "This statement is more profound than it sounds. Of course, we must do our best to get it right and, of course, we must not hesitate to correct our errors.  We must, however, *decide*.  Failure to act is oft-times as injurious to justice as judicial error."  William G. Young, <u>The Judge's Common Book</u>, https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.mad.uscourts.gov/boston/pdf/young/THE%2520JUDGE%2527S%2520COMMON%2520BOOK.pdf&ved=2ahUKEwitwKHnoJ6LAxXbLFkFHcwhCYwQFnoECAcQAQ&usg=AOvVaw3qz-BHr5Ve9ETPjQ5Hf-q5.

Alzheimer's drug Aduhelm.  On May 10, 2024, the plaintiff
Oklahoma Firefighters Pension and Retirement System ("the
Firefighters") moved to certify a class consisting of "[a]ll
persons and entities who purchased or otherwise acquired common
stock of Biogen, Inc. between June 8, 2021, and January 11,
2022," with certain exclusions.  Lead Pl.'s Mem. Supp. Mot.
Certify Class ("Pl.'s Mem. Supp.") 1, ECF No. 80; see also Lead
Pl.'s Mot. Certify, ECF No. 79.  After briefing and oral
argument, on September 5, 2024 this Court allowed the
Firefighters' motion to certify the class, provided that the
class period shall end on July 12, 2021.  Elec. Order, ECF No.
100; Elec. Order, ECF No. 108.  On December 9, 2024, after
cross-petitions for leave to appeal were brought pursuant to
Rule 23(f) of the Federal Rules of Civil Procedure, a panel of
the First Circuit Court of Appeals ordered this Court to enter a
memorandum reflecting its "rigorous analysis" of the relevant
Rule 23 class certification factors within sixty days.  USCA
Order, ECF No. 143.  This memorandum sets out the Court's
reasoning for its certification decision.[2]

---

[2] Remember learning long division in grade school? Quite
properly the teacher would say, "Show your work!" to ensure that
the student understood the steps in long division,
notwithstanding any addition or subtraction errors.  So here.

## II. ANALYSIS

### A. Legal Standard

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

"To qualify for class certification under Rule 23, a plaintiff must demonstrate that: 1) there are so many class members that joinder of all members is impracticable; 2) common questions of law or fact exist among the class members; 3) the named plaintiff's claims or defenses are typical of those of the class; and 4) the named plaintiff will fairly and adequately represent the interests of the class." Wortman v. LogMeIn, Inc., No. 18-11475-GAO, 2022 WL 3714620, at *1 (D. Mass. Aug. 29, 2022) (O'Toole, J.) (citing Fed. R. Civ. P. 23(a)). These are also known as the Rule 23(a) requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. See Fed. R. Civ. P. 23(a); Wal-Mart Stores, 564 U.S. at 349.

In addition affirmatively to establishing the Rule 23(a) requirements, the party seeking class certification must also establish one of the three grounds listed under Rule 23(b). See

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997); Smilow
v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st
Cir. 2003).  If challenged, the party seeking class
certification must establish the facts underlying the Rule 23(a)
and 23(b) requirements by a preponderance of the evidence.  In
re Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015)
(citing Messner v. Northshore Univ. HealthSystem, 669 F.3d 802,
811 (7th Cir. 2012)).  "Once plaintiffs have made their initial
showing, defendants have the burden of producing sufficient
evidence to rebut the plaintiff's showing."  In re Nexium, 777
F.3d at 27.

      In reviewing requests for class certification, the district
court must conduct a "rigorous analysis," which oftentimes will
"entail some overlap with the merits of the plaintiff's
underlying claim."  Wal-Mart Stores, 564 U.S. at 351 (quoting
General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161
(1982)).  A court must not, however, "turn the class-
certification proceeding into an unwieldy trial on the merits."
In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 17 (1st Cir.
2005).

      **B. Rule 23(a)**

            **1. Numerosity**

      For a class to be certified, it must be "so numerous that
joinder of all members is impracticable."  Fed. R. Civ. P.

23(a)(1).  Courts refer to this as the "numerosity" requirement.
See, e.g., Wal-Mart Stores, 564 U.S. at 349; General Tel., 457
U.S. at 156.  While there is no minimum number of class members
needed to satisfy this requirement, as a general matter, courts
have held that if the moving party can establish that its
class's potential members exceed 40, the requirement has been
met.  See, e.g., Garcia-Rubiera v. Calderon, 570 F.3d 443, 460
(1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-
27 (3d Cir. 2001)) ("No minimum number of plaintiffs is required
to maintain a suit as a class action, but generally if the named
plaintiff demonstrates that the potential number of plaintiffs
exceeds 40, the first prong of Rule 23(a) has been met.").
"[I]n a securities class action, the class size may be
reasonably inferred to be in the hundreds of thousands when
there are 'millions of shares outstanding and [] millions of
transactions during the class period.'"  In re AVEO Pharms.,
Inc. Sec. Litig., No. 13-11157, 2017 WL 5484672, at *3 (D. Mass.
Nov. 14, 2017) (Casper, J.) (quoting In re Evergreen Ultra Short
Opportunities Fund Sec. Litig., 275 F.R.D. 382, 388 (D. Mass.
2008) (Gorton, J.)).

The Firefighters have shown that hundreds of millions of
shares of Biogen stock were traded during the initial proposed
class period, averaging 1.54 million shares traded per day, and
that at least 1,858 institutional investors owned stock during

that period.  Decl. Jeffrey C. Block ("Block Decl."), Ex. A,
Report Market Efficiency and Damages Methodology, Prof. Steven
P. Feinstein, PhD, CFA ("Feinstein Report") ¶¶ 54, 66, ECF No.
79-1.  Although this Court shortened the class period from the
one proposed, "numerosity can be assumed where the number of
shares traded is so great that common sense dictates the class
is very large."  In re Bos. Sci. Corp. Sec. Litig., 604 F. Supp.
2d 275, 281 (D. Mass. 2009) (Woodlock, J) (quoting Grace v.
Perception Tech. Corp., 128 F.R.D. 165, 167 (D. Mass. 1989)
(Harrington, J.).  Given the high trading volume and the 148.52
million shares outstanding on average during the proposed class
period, this is such a case.  Feinstein Report ¶ 91.  Biogen has
not contested this issue.  The Firefighters have carried their
burden to show that the class is so numerous that joinder would
be impracticable, and therefore the numerosity requirement of
Rule 23(a)(1) is satisfied.

### 2. Commonality

For a class to be certified, there must also be "questions
of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).
Courts have called this the "commonality" requirement.  See,
e.g., Wal-Mart Stores, 564 U.S. at 349; General Tel., 457 U.S.
at 156.  A question is common if it is "capable of classwide
resolution -- which means that determination of its truth or
falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke." <u>Wal-Mart Stores</u>, 564
U.S. at 350; <u>see also</u> <u>Parent/Professional Advocacy League</u> v.
<u>City of Springfield</u>, 934 F.3d 13, 28 (1st Cir. 2019).  At its
crux, commonality is typically about "'a particular and
sufficiently well-defined set of allegedly illegal policies [or]
practices' that work similar harm on the class plaintiffs."
<u>Parent/Professional Advocacy League</u>, 934 F.3d at 28 (alteration
in original) (quoting <u>Parsons</u> v. <u>Ryan</u>, 754 F.3d 657, 679 (9th
Cir. 2014)).

    To meet this commonality standard, a class need not
establish that every question of law or fact is identical;
rather, the existence of a single significant common issue of
fact or law is sufficient.  <u>In re Pharmaceutical Indus. Average
Wholesale Price Litig.</u>, 230 F.R.D. 61, 78 (D. Mass. 2005)
(Saris, J.).  "The threshold of 'commonality' is not high." <u>Id.</u>
(quoting <u>Jenkins</u> v. <u>Raymark Indus., Inc.</u>, 782 F.2d 468, 472 (5th
Cir. 1986)).  "The existence of shared legal issues with
divergent factual predicates is sufficient, as is a common core
of salient facts coupled with disparate legal remedies within
the class." <u>Id.</u> (quoting <u>Hanlon</u> v. <u>Chrysler Corp.</u>, 150 F.3d
1011, 1019 (9th Cir. 1998)).  In securities class actions,
courts routinely find that the commonality requirement is
satisfied when plaintiffs allege damages due to

misrepresentations and seek damages calculations.  In re
Evergreen, 275 F.R.D. 382, 388-89 (collecting cases).

    The class members' claims here all arise out of the same
alleged misrepresentations, which the Firefighters claim
artificially inflated Biogen's stock price during the class
period.  See Pl.'s Mem. Supp. 8-9.  Issues of misrepresentation,
scienter, loss causation, and damages measurement are common to
all class members.  See In re AVEO Pharms., 2017 WL 5484672, at
*4.  Where, as here, certification depends on satisfying the
more stringent Rule 23(b)(3) predominance requirement, moreover,
the commonality requirement becomes "largely irrelevant."  In re
Boston Sci. Corp., 604 F. Supp. 2d 275, 281 (D. Mass. 2009)
(Woodlock, J.) (quoting Grace, 128 F.R.D. at 167).  Biogen has
not contested this issue.  The Firefighters have carried their
burden to show that class members' claims share legal issues and
a common core of salient facts, and therefore the commonality
requirement of Rule 23(a)(2) is satisfied.

    **3. Typicality**

    For a class to be certified, "the claims or defenses of the
representative parties" must be "typical of the claims or
defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Courts refer
to this as the "typicality" requirement.  See Wal-Mart Stores,
564 U.S. at 349; General Tel., 457 U.S. at 156.  This
requirement is met when the lead plaintiff's "injuries arise

from the same events or course of conduct as do the injuries of the class, and . . . its claims are based on the same legal theory as those of the class." In re Boston Sci. Corp. Sec. Litig., 604 F. Supp. 2d at 282. Typicality is met whenever there is "congruence between particular claims of the named class representatives and the generalized claims that are common to the class." Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 26 (D. Mass. 2003) (Gertner, J.); see also In re Suffolk Univ. Covid Refund Litig., No. 20-10985, 2022 WL 6819485, at *1 (D. Mass. Oct. 11, 2022). "[C]lass representatives' claims can be considered typical even where there is some factual variation among the claims of different class members." In re Evergreen, 275 F.R.D. at 390.

The Firefighters' claims are based on the same factual and legal premises as those of the proposed class members: alleged misrepresentations that inflated Biogen's stock price during the class period, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act. 2d Am. Compl. ("SAC") ¶ 3, ECF No. 75. The Firefighters thus have "the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." In re AVEO Pharms., 2017 WL 5484672, at *4 (quoting In re Evergreen, 275 F.R.D. at 389). Biogen has not contested this issue. The Firefighters have carried their

[9]

burden to show that there is congruence between the class representative's claims and those of the class, and therefore the typicality requirement of Rule 23(a)(3) is satisfied.

### 4. Adequacy

The final requirement for class certification under Rule 23(a) is that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts commonly refer to this as the "adequacy of representation" requirement. See Wal-Mart Stores, 564 U.S. at 349; General Tel., 457 U.S. at 156.

To satisfy the adequacy requirement, the moving party must meet a two-step standard: "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). "For the adequacy of class representatives, in a securities fraud class action, 'the timing of class members' purchase and sale of the [] stock' does not create conflicts precluding classification if it is outweighed by 'the common interest in establishing misrepresentations made by defendants.'" In re AVEO Pharms., 2017 WL 5484672, at *4 (quoting In re Evergreen, 275 F.R.D. at 392). Adequacy of

counsel may be judged by counsel's work to identify and investigate claims, its experience in handling class actions, complex litigation, and similar claims, its knowledge of the relevant law, and the resources it has committed to the class. Id.; Fed. R. Civ. P. 23(g)(1)(A).

The Firefighters' interests are aligned with those of the class members because their claims are based on the same misrepresentations as those of the class. See supra section II.B.3. Likewise, based on its representation of the Firefighters to date and its prior experience with securities class action litigation, the proposed class counsel is adequate. See Block Decl., Ex. C, Block & Leviton Firm Resume. Biogen has not contested these issues. The Firefighters have carried their burden to show that the class representative and its proposed counsel adequately represent the interests of the class, and therefore the adequacy requirement of Rule 23(a)(4) is satisfied.

***

For the reasons set out above, the Court rules that the Firefighters successfully establish the four requirements for class certification under Rule 23(a). The Court next turns to an analysis of the Rule 23(b) requirements.

### C. Rule 23(b)(3) -- Predominance

Under Rule 23(b)(3), the Firefighters must demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) is thus a two-prong test of "predominance and superiority." In re Boston Sci. Corp., 604 F. Supp. 2d at 282. Superiority is not contested here, and this Court agrees with the Firefighters that the number of parties allegedly harmed makes joinder impracticable and individual litigation burdensome and expensive, satisfying the superiority requirement. Pl.'s Mem. 2-3, 19-20; see In re Evergreen, 275 F.R.D. at 393.

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 276 (2014) (Halliburton II). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. "[T]he need for some individualized determinations at the liability and damages stage does not defeat class certification. . . . Rather, the question is whether there is 'reason to think that [individualized]

questions will overwhelm common ones and render class
certification inappropriate[.]'"  In re Nexium, 777 F.3d at 21
(quoting Halliburton II, 573 U.S. at 276).

The First Circuit has noted that, in conducting a
predominance inquiry, "a district court must formulate some
prediction as to how specific issues will play out in order to
determine whether common or individual issues predominate in a
given case."  Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d
288, 298 (1st Cir. 2000).  "In order to obtain class
certification, a plaintiff at all times bears the burden of
demonstrating that the Rule 23 requirements have been
satisfied."  Southern States Police Benev. Ass'n, Inc. v. First
Choice Armor & Equip., Inc., 241 F.R.D. 85, 90 (D. Mass. 2007)
(Gorton, J.) (first citing Smilow, 323 F.3d at 38; and then
citing Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 257
(D. Mass. 2005)).

### 1. Reliance

"Whether common questions of law or fact predominate in a
securities fraud action [under § 10(b) of the Securities
Exchange Act of 1934] often turns on the element of reliance."
Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810
(2011) (Halliburton I).[3]  "[P]roof of reliance ensures that there

---

[3] "The elements of a private securities fraud claim based on
violations of § 10(b) . . . are: (1) a material

is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988)).

In Basic Inc. v. Levinson, the Supreme Court established that securities fraud class action plaintiffs may invoke a rebuttable presumption of reliance by showing "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton II, 573 U.S. at 268; see Basic Inc., 485 U.S. at 248 n.27. This is known as the "fraud-on-the-market" theory, which reflects the premise that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Basic Inc., 485 U.S. at 246.

The Basic factors are not all treated equally. Materiality need not be proved at the class-certification stage, "[b]ecause a failure of proof on the issue of materiality, unlike the issues of market efficiency and publicity, does not give rise to

---

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Halliburton I, 563 U.S. at 809-10 (cleaned up).

any prospect of individual questions overwhelming common ones."
Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455,
474 (2013).  Rather, "the failure of common proof on the issue
of materiality ends the case for the class and for all
individuals alleged to compose the class."  Id.  To hold
otherwise, the Supreme Court has observed, "would necessitate a
mini-trial on the issue of materiality at the class-
certification stage," wasting judicial resources and flouting
Federal Rule of Civil Procedure 23(c)(1)(A)'s command that
courts ought make certification decisions at an "early
practicable time."  Id. at 477.

The issue of price impact, on the other hand -- that is,
whether an alleged misrepresentation was reflected in the market
price at the time of the relevant transactions -- "has
everything to do with the issue of predominance at the class
certification stage."  Halliburton II, 573 U.S. at 283.  This is
because Basic's "fundamental premise" is "that an investor
presumptively relies on a misrepresentation **so long as** it was
reflected in the market price at the time of his transaction."
Halliburton I, 563 U.S. at 813 (emphasis added); see also
Halliburton II, 573 U.S. at 283.  Thus, defendants confronted
with a fraud-on-the-market theory-based presumption of reliance
must be afforded an opportunity to rebut the Basic presumption
by "sever[ing] the link between the alleged misrepresentation

[15]

and [] the price paid . . . by the plaintiff" through direct and indirect price impact evidence.  Id. at 269 (quoting Basic Inc., 485 U.S. at 248).

The distinction between materiality and price impact is a subtle one.  A misrepresentation "is material if a 'reasonable investor would have viewed it as having significantly altered the total mix of information made available.'"  Zhou v. Desktop Metal, Inc., 120 F. 4th 278, 292 (1st Cir. 2024) (quoting Ponsa-Rabell v. Santander Sec. LLC, 35 F. 4th 26, 33 (1st Cir. 2022)).  This is a "mixed question of law and fact," TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976), a "fact-specific inquiry," Basic Inc., 485 U.S. at 240, and an "objective issue susceptible to common, classwide proof," Halliburton II, 573 U.S. at 282.  While materiality goes to the question whether a reasonable investor could have relied on the alleged misrepresentations, "price impact" asks "whether the alleged misrepresentations affected the market price in the first place."  Halliburton I, 563 U.S. at 814.[4]

---

[4] Price impact must also be distinguished from "loss causation," which asks whether "the defendant's deceptive conduct caused [the plaintiffs'] claimed economic loss," and which plaintiffs need not prove at the certification stage.  Halliburton I, 563 U.S. at 807.  This distinction is important, because it keeps in focus that it is not a plaintiff's burden, at certification, to show that any alleged losses were attributable **only** to the alleged misrepresentations.  "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do

Biogen does not dispute that the Firefighters have established the requisite <u>Basic</u> factors -- that is, publicity, market efficiency, and market timing. <u>See</u> Pl.'s Mem. Supp. 13-18; <u>but see</u> Defs.' Mem. Opp'n Mot. Certify ("Defs.' Mem. Opp'n") 6, ECF No. 87 (reserving right to criticize the Firefighters' expert report further). Rather, Biogen invokes its right to undercut the <u>Basic</u> presumption by showing a total lack of price impact. Defs.' Mem. Opp'n 1-4. To this end, Biogen argues that the Firefighters have in effect hoisted themselves on their own petard, presenting this Court with an expert event study that itself shows that the alleged misrepresentations had no impact on price. <u>See</u> Defs.' Sur-Reply Mem. Opp'n Mot. Certify ("Defs.' Sur-Reply") 1-2, ECF No. 94; Declaration of Michael S. Hines ("Hines Decl."), Ex. 1, Expert Report of Jennifer Marietta-Westberg, Ph.D. ("Marietta-Westberg Report") ¶¶ 25-46, ECF No. 88-1. In support of this argument, Biogen presents its own expert report, although not its own separate event study. <u>See</u> Marietta-Westberg Report. The Firefighters have presented a rebuttal report. Pl.'s Reply Supp. Mot. Certify, Ex. 2,

---

with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory." <u>Id.</u> at 813. Rather, at certification, once the plaintiff has shown that the <u>Basic</u> factors apply, the defendant has the burden of persuasion to show that the alleged misrepresentations had **no** impact on price, severing the link between misrepresentation and price impact. <u>Goldman Sachs Grp., Inc.</u> v. <u>Arkansas Tchr. Ret. Sys.</u>, 594 U.S. 113, 125-27 (2021).

Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA,
("Feinstein Rebuttal Report"), ECF No. 90-2.

This Court agrees that the Firefighters have carried their
burden to show that the Basic factors apply, and thus proceeds
to the question whether Biogen has successfully rebutted the
premise of price impact that underlies the Basic presumption.
For the reasons given below, it concludes that Biogen has not
done so. Independent of the predominance issue, however, this
Court is compelled to extend the class period no further than
the impact of the July 12 corrective disclosure identified by
the Firefighters, because that is the date on which the alleged
misrepresentations were unambiguously cured. Thus, this Court
ALLOWED the motion to certify the class, provided that the class
period shall extend no further than July 12, 2021.

### a. Price Impact Defined

The Firefighters allege that, "[f]ueled by [Biogen's] false
and misleading statements, Biogen's stock price skyrocketed
following the FDA's approval of Aduhelm," then, after the market
learned the truth, "Biogen's stock price fell . . . well below
its pre-FDA approval price, removing all the inflation in
Biogen's stock." SAC ¶ 4. Biogen argues that there is no
evidence that the alleged misrepresentations impacted the price
of Biogen's stock at any time, see Defs.' Mem. Opp'n 12-17, and
that the Firefighters' own event study shows no statistically

significant price increase or decrease either at the "front end"
when the alleged misrepresentations were made or at the "back
end" when they were allegedly corrected, see Defs.' Sur-Reply 1-
5.  The Firefighters rebut by characterizing Biogen's argument
as a premature loss causation challenge, and argue that Biogen
cannot meet its burden of proving no price impact merely by
pointing to the Firefighters' own event study, which in any case
was prepared to show market efficiency, not price impact.  See
generally Pl.'s Reply Supp. Mot. Certify ("Pl.'s Reply"), ECF
No. 90.

"In assessing price impact at class certification, courts
'should be open to all probative evidence on that question --
qualitative as well as quantitative -- aided by a good dose of
common sense.'"  Goldman, 594 U.S. at 122 (quoting In re
Allstate Corp. Securities Litig., 966 F.3d 595, 613, n. 6 (7th
Cir. 2020)).  This is so "regardless whether the evidence is
also relevant to a merits question like materiality."  Id.  As
the Supreme Court has observed, "materiality and price impact
are overlapping concepts and . . . the evidence relevant to one
will almost always be relevant to the other."  Id. at 122 n.2.
Courts must assess all evidence relevant to price impact "while
resisting the temptation to draw what may be obvious inferences
for the closely related issues that must be left for the merits,

including materiality." Id. (quoting In re Allstate Corp. Sec. Litig., 966 F.3d at 608)).

Under an inflation-based theory of price impact like the one advanced here, "price impact is the amount of price inflation maintained by an alleged misrepresentation -- in other words, the amount that the stock's price would have fallen 'without the false statement.'" Id. at 123 (quoting Glickenhaus & Co. v. Household Int'l, Inc., 787 F. 3d 408, 415 (7th Cir. 2015)). In cases based on an inflation theory, the inference of price impact "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," for example, "when the earlier misrepresentation is generic . . . and the later corrective disclosure is specific," because then "it is less likely that the specific disclosure actually corrected the generic misrepresentation" and "there is less reason to infer front-end price inflation -- that is, price impact -- from the back-end price drop." Id.

This Court allowed the motion to certify the class with a class period ending July 12, 2021, Elec. Orders, ECF Nos. 100, 108, because, although Biogen did not meet its burden of showing no price impact in the whole class period, Biogen persuasively argued that the alleged misrepresentations were corrected by the disclosure on that date. While a predominance issue under Goldman might have arisen with respect to the proposed class

period ending January 11, 2022, this Court in its judgment determined that the <u>Basic</u> presumption of reliance was supported with respect to the certified class period beginning with the June 8, 2021 misrepresentations and terminating with the July 12, 2021 disclosure.

In so ruling, this Court is mindful of the difficult distinction between price impact and materiality, and of the relative novelty of the case law it applies.  Since it is required to consider all probative evidence in deciding this issue, moreover, this Court could not agree with the Firefighters that it was <u>prima facie</u> impossible for Biogen to carry its burden of showing no price impact by relying, as it does, mostly on the Firefighters' own expert report, and reasoning about the nature of the misrepresentations and disclosures.  Rather, as the Supreme Court requires, <u>all</u> relevant evidence was considered.

### b. The Class Period

The Firefighters initially proposed a class period beginning June 7, 2021 and ending January 11, 2022, SAC ¶ 3, but later clarified that the alleged misrepresentations were made on June 8, 2021, Pl.'s Mem. Supp. 3.  As it stands, the Firefighters' motion to certify depends on two nearly identical misrepresentations: defendant former Biogen CEO Michel Vounatsos's statements on a conference call on June 8, 2021, the

day after Aduhelm's approval, that, "[f]or Medicare fee-for-service, coverage is automatically presumed with FDA approval," and that Biogen expected "most Medicare Advantage plans to define their medical policies within the first several months after launch," and defendant Biogen U.S. President Alisha Alaimo's essentially identical statement on the same day, to which she added that Biogen expected "commercial plans to define their medical policies . . . within the first several months after launch."  SAC ¶¶ 187, 192.

The Firefighters allege that these statements were false and misleading when made, because they "misrepresented that Biogen expected that what typically occurs with Medicare coverage for newly FDA-approved treatments would happen for Aduhelm," when in fact as early as summer 2020 Biogen expected that, if the drug received broad FDA approval, the U.S. Centers for Medicare and Medicare Service ("CMS") would likely initiate a National Coverage Determination ("NCD"), which is typically a 12-18 month process, and that this would likely lead to narrower coverage than the FDA approval itself would indicate.  Id. ¶¶ 188-91, 193.

The Firefighters proposed a class period end date of January 11, 2022, because that was the date on which CMS released its draft opinion limiting Medicare reimbursement for Aduhelm patients to those enrolled in clinical trials.  Id. ¶¶

20, 26, 270-71.  Thus, the proposed class period was based on a fit between the initial misrepresentation that Medicare coverage of Aduhelm was presumed automatic and would be determined by Medicare Advantage and commercial plans within the first several months after launch, and a determination by CMS that Medicare coverage for Aduhelm would be far from "automatic," but rather severely restricted.  See Pl.'s Reply 2-3.

In certifying a class with a class period ending July 12, 2021, this Court instead credited Biogen's argument that the announcement of the NCD process itself corrected the initial misrepresentations by making it clear that the process of determining Medicare coverage for Aduhelm would be, as Biogen allegedly expected, lengthy and complex -- that is, not automatic, and not likely to be determined within the first several months after launch.  See Defs.' Sur-Reply 4-5, 9.  The Firefighters argued instead that the announcement of an NCD determination did not fully correct the misrepresentations because the "implications" of the NCD announcement were at first unclear, and were in fact portrayed in some reporting, and later on by Biogen's own statements, to be at least potentially positive.  Pl.'s Reply 9-12.  The Firefighters also pointed out that this Court itself, in an order issued March 19, 2024 reconsidering its initial dismissal of the case, characterized Biogen's misrepresentations as going to the question of

Aduhelm's anticipated Medicare coverage overall, in addition to
the narrower question of whether a lengthy NCD process would be
initiated.  Pl.'s Reply 2-3, 9-10; Mem. & Order ("Order"), ECF
No. 68.  In that Order, as the Firefighters observed, this Court
wrote that "for some time before the relevant statements,
Biogen's middle management were discussing the high likelihood
that they would have a longer process and get narrower Medicare
coverage for ADUHELM," and that there was therefore "a cogent
inference of scienter on the part of the Executives, since they
likely knew when they made their public statements that ADUHELM
would actually get a much narrower Medicare approval."  Order
10.

     Whatever Biogen knew or expected, this Court cannot stretch
the alleged misrepresentations beyond what they actually say.
Biogen did not say on June 8, 2021, "Aduhelm will be fully
covered by Medicare," while expecting that it would not be;
rather, it said coverage was automatically presumed, and that it
expected coverage policies to be defined within several months
from launch, while, allegedly, expecting that the automatic
presumption would not be applied to Aduhelm, and that the
coverage determination process would be much longer, with
uncertain, and likely narrower, results.  See SAC, Ex. B.,
Biogen Docs. 79, ECF No. 75-2.  The scienter allegations
discussed in this Court's prior order were enough to raise an

inference that Biogen's representations about the application of
the automatic presumption and speedy determination of coverage
plans were knowingly false, in part **because** Biogen may have
ultimately expected more limited Medicare coverage, but this
does not change the nature of what Biogen actually said: it
stated that coverage was automatically presumed and that it
expected plans to define their policies within several months,
not that all or even most Medicare plans would cover Aduhelm.[5]
The Firefighters themselves summarize the core of their argument
against Biogen regarding these statements in the SAC in this
way: "Defendants knew, or recklessly disregarded, **that coverage
would not be 'automatic,'** regardless of what typically happens

---

[5] This issue is analogous to one raised recently in the
price impact context.  In the Goldman case, the Supreme Court
ordered the court of appeals to consider, on remand, the generic
nature of the alleged misrepresentation, as compared with the
specificity of the alleged corrective disclosure, in deciding
whether the defendants had successfully severed the link between
the misrepresentation and the price paid by the plaintiffs, and
so whether the Basic presumption had been rebutted.  Goldman,
594 U.S. at 123-27.  In later correcting the district court's
application of that standard, the Second Circuit observed that
this task required the court to ask not what would have happened
if the defendant had spoken some truth more or less specific
than the alleged misrepresentation, but rather how the market
would have reacted "had the company spoken truthfully regarding
its . . . problems at an **equally generic level**." Arkansas Tchr.
Ret. Sys. v. Goldman Sachs Grp., Inc., 77 F. 4th 74, 98 (2d Cir.
2023) (emphasis added).  Similarly, here, the January 11
announcement of the NCD process's result was more specific and
otherwise different than the June 8 alleged misrepresentations,
which went to Biogen's expectations of the determination **process**
and its speed.

with FDA-approved treatments." SAC ¶ 20 (emphasis added). The fact that coverage would not be automatic was fully revealed by the July 12 announcement of a lengthy NCD review process. In other words, one cannot misrepresent what one does not represent at all.[6]

In making this determination, this Court did not engage in price impact or materiality analysis. Although, at class certification, this Court must avoid deciding fact-intensive issues properly reserved to the merits stage, see Karinski v. Stamps.com, Inc., No. CV 19-1828-MWF(SKx), 2020 WL 6572660, at *7 (C.D. Cal. Nov. 9, 2020), "[i]n a securities fraud class action, 'courts are **required** to cut off the class period on the date of a statement or event that cures the market,'" Pirnik v.

---

[6] The Firefighters' SAC refers once to a "duty to disclose," SAC ¶ 285, and more generally in several places to "omissions," see, e.g., id. ¶¶ 16, 279, 281, but the Firefighters have not developed an omission-based theory of liability extending beyond the representation regarding the automatic presumption, and the only specific omissions described in the SAC refer to statements not at issue here, id. ¶ 184. The securities laws "do not create an affirmative duty to disclose any and all material information"; rather, they "only prohibit omissions that engender 'half-truths'" by "render[ing] affirmative statements made misleading." Zhou, 120 F. 4th at 292 (first quoting Macquarie Infrastructure v. Moab Partners, L. P., 601 U.S. 257, 263 (2024); and then quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)). Moreover, plaintiffs must, "with respect to each act or omission alleged[,] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

Fiat Chrysler Autos., N.V., 327 F.R.D. 38, 48 (S.D.N.Y. 2018)
(emphasis added) (quoting Carpenters Pension Tr. Fund of St.
Louis v. Barclays PLC, 310 F.R.D. 69, 97 (S.D.N.Y. 2015)).
Biogen persuasively argued that the market was cured by the July
12, 2021 disclosure.  "[T]he district court 'is not bound by the
class definition proposed in the complaint and should not
dismiss the action simply because the complaint seeks to define
the class too broadly.'"  Lundquist v. Security Pac. Auto. Fin.
Servs. Corp., 993 F.2d 11, 14 (2d Cir. 1993) (quoting Robidoux
v. Celani, 987 F.2d 931, 937 (2d Cir. 1993)); see also Bruns v.
Mayhew, No. 1:12-cv-00121-JAW, 2013 WL 12233685, at *8 n.1 (D.
Me. Mar. 25, 2013) (citing Robidoux, 987 F.2d at 937) (altering
plaintiffs' proposed class definition).  "[W]hen the record
warrants, it is appropriate for a district court to modify a
proposed class period based on clear, unambiguous disclosures."
In re SunEdison, Inc. Sec. Litig., 329 F.R.D. 124, 134-35
(S.D.N.Y. 2019) (citing Yi Xiang v. Inovalon Holdings, Inc., 327
F.R.D. 510, 521-22 (S.D.N.Y. 2018); and then citing In re Smart
Techs, Inc. S'holder Litig., 295 F.R.D. 50, 58 (S.D.N.Y. 2013)).
Because the scienter issue decided in the previous Order is
distinct from the market correction issue, this Court is free to
rule, as it did in issuing its certification order, that the

alleged misrepresentations were fully corrected by the July 12, 2021 disclosure, without reaching the issue of materiality.[7]

Both parties object to the class period this Court has drawn.  Biogen argues that the June 28, 2021 Wall Street Journal article cited by the Firefighters in their SAC corrected the initial misrepresentations by suggesting, as that article's headline put it, that Biogen's "Costly New Alzheimer's Drug Could Force Medicare to Restrict Access."  Defs.' Mem. Opp'n 10, 19-20; Defs.' Sur-Reply 9; SAC. ¶¶ 217, 296.  For their part, the Firefighters argue that, because the NDC announcement was accompanied in some publications by a distinctly positive spin, it is not clear that all impact of the initial misrepresentations was -- so to speak -- washed out, even as late as July 12.  Pl.'s Reply 11-12; see Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP, 623 F. Supp. 3d 470, 492 (E.D. Pa. 2022) ("[A] partial disclosure of negative information does

---

[7] This Court also notes, without resting its decision on this basis, that the proposed class period would likely have raised predominance issues under Goldman, for the reasons described supra, at note 5: the January 11, 2022 disclosure simply is not a fit for the June 8 misrepresentations.  As the Supreme Court in Goldman described, the price impact inference "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," particularly "when the earlier misrepresentation is generic . . . and the later corrective disclosure is specific," making it "less likely that the specific disclosure actually corrected the generic misrepresentation."  594 U.S. at 123.  Issues of manageability and superiority would also have likely followed.

not necessarily relieve a company of liability if the disclosure to the public was still more optimistic than the truth privately known by the Defendants.").

Ultimately, this Court disagreed with both arguments. As to Biogen's June 28 versus July 12 argument, this Court judged that it could not find that the alleged misrepresentations were unambiguously cured based on a single article that represented no more than informed speculation that an NDC process **could** be applied to Aduhelm. Rather, the July 12 disclosure that there **would** be a lengthy review process cured the initial misrepresentations. In urging this Court to closely consider the impact of one June 28 article, Biogen asked this Court to engage in precisely the kind of fact-intensive parsing of disclosure impacts that is "a loss causation analysis not appropriate at this stage." Homyk v. ChemoCentryx, Inc., No. 4:21-cv-03343-JST, 2024 WL 1141699, at *4 (N.D. Cal. Mar. 6, 2024) (quoting Boston Ret. Sys. v. Alexion Pharms., Inc., No. 3:16-cv-2127(AWT), 2023 WL 2932485, at *12 (D. Conn. Apr. 13, 2023)). Moreover, even if this Court were in "equipoise" as to the misrepresentations' impact after June 28, it would be required to side with the plaintiffs on the price impact issue because the burden of persuasion rests with Biogen. Goldman, 594 U.S. at 127.

As to the Firefighters' argument that the class period ought extend beyond July 12 because the misrepresentations had not been fully corrected by that date, a close look at the facts of Allegheny Cnty. -- the case on which the Firefighters primarily rely for this argument -- is instructive: that case involved a new misleading "update" disclosure as to a project completion timeline and another disclosure as to which the defendants "actively" concealed the "true impact."  623 F. Supp. 3d at 491-92, 495.  Here, the Firefighters allege that the market did not fully understand the import of the announced NCD on July 12, but do not allege either an incomplete "update" disclosure on Biogen's part or any active spin, at least until statements made on a July 22, 2021 earnings call, which itself only celebrated the NCD as an opportunity for "clarity" and "consistency."  Pl.'s Reply 12; SAC ¶ 234.  These would be interesting arguments for the merits stage if Biogen had represented that all or even most Medicare plans would cover Aduhelm, but again, Biogen can only be held liable for what it actually said: that coverage was automatically presumed upon FDA approval, and that it expected coverage policies to be announced within "several months."  SAC ¶¶ 187, 192.  These misrepresentations were corrected by the announcement of a lengthy, non-automatic coverage determination process.  SAC ¶ 188.  To rule otherwise, moreover, would be at least potentially

to raise a scienter issue with the Firefighters' pleading: without an "update" misrepresentation suggesting a favorable result from the NCD process, or some act of active concealment on Biogen's part, it is hard to see how Biogen can be said to have knowingly misrepresented its expectations regarding a process that it represented -- according to the Firefighters themselves -- would not take place.[8]

### c. "Front End" and "Back End" Price Impact Analysis

Up to this point, this Court has dealt with the price

---

[8] Allegheny Cnty. also collects authority for a slightly different proposition: that price impact can be shown, in some cases, by price fluctuations within a two- or even five-day "event window" following on the disclosures that allegedly affected the stock price. 623 F. Supp. 3d at 485-88. This Court notes, without deciding, that its limitation of the class period to those who purchased stock up to the time of the July 12 disclosure does not necessarily bar it from considering later stock price drops, should they be found to have represented a delayed market reaction to the July 12 disclosure. In other words, the class period may still be modified, in response to a more granular analysis of materiality and loss causation that the Court judged improper at this stage. As persuasive precedent indicates, "the class period ends when the full truth has been disclosed to the market and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security." In re Oxford Health Plans, Inc., 191 F.R.D. 369, 378 (S.D.N.Y. 2000). It seemed to this Court that close parsing of the reasonable reliance issue day-by-day post-correction would require it "to adjudicate in advance of trial when the market had responded to a truthful and complete disclosure." Id. It chose instead to certify the class based on the date of the corrective disclosure while keeping in mind, as always, that "any order declaring a class is subject to modification as the litigation goes forward." Id.

impact and class period issues as matter of law, applying
Goldman and other relevant case law to match the alleged
misrepresentations with alleged disclosures and determine the
class period in which the Firefighters' case may be maintained.
It must now deal with the more empirical issues raised by the
Biogen -- that is, with whether the Firefighters' own expert
study shows, in its analysis of the statistical significance of
changes in Biogen's price relative to the broader pharmaceutical
and biotechnology markets within the proposed class period, that
there was no price impact either at the "front end" when the
misrepresentations were made, or at the "back end" at the time
of the corrective disclosures, thus defeating the presumption of
reliance for even the more limited class period ending on July
12, 2021.

As Biogen argues, the expert report prepared by the
Firefighters itself shows no statistically significant "residual
return" -- that is, statistically significant positive or
negative price movement of Biogen's stock relative to the rest
of the market and the stock's corresponding market sectors -- in
the days following the June 8, 2021 alleged misrepresentations.
Feinstein Report 131. After a sharp rise when Aduhelm's FDA
approval was announced on June 7, Biogen's stock price stagnated
relative to the market on June 8, 9, and 10, followed by returns
that are statistically significant to the 95% and 90% confidence

level, respectively, on June 11 and 14.  Id.; SAC ¶ 7.
Statistically significant returns also occurred on June 18, 21,
and 24, and July 7, 8, and 9, but not in close proximity to the
alleged corrective disclosures on June 28 and July 12.
Feinstein Report 131.  A statistically significant drop at the
high 99% confidence level occurred, however, on July 15, three
days after the announcement of the NCD process.  Id.  The
Firefighters' counsel further asserted at oral argument that
Biogen's expert report had not dealt with the possible
connection between the statistically significant drops on June
11 and June 24 and alleged partial disclosures discussed in the
Firefighters' Reply.  Tr. Hr'g Mot. Certify 10, ECF No. 106;
Pl.'s Reply 14-15.

   The lack of statistically significant residual returns at
the front and back ends of the class period does not in itself
show lack of price impact.  Rather, "numerous courts have
recognized that as a matter of logic such absence of proof is
not proof of absence."  Allegheny Cnty., 623 F. Supp. 3d at 487-
88 (collecting cases).  Indeed, as the Firefighters point out,
Biogen's stock did hold steady relative to the broader
pharmaceutical and biotechnology markets on June 8, 9, and 10,
despite the Firefighters' expert's finding that this relative
strength was not a statistically significant residual return on
any one date.  Pl.'s Reply 13-14 n.5 ("[Biogen] ignore[s] that

[33]

on June 8, 2021, the Pharmaceutical Index as a whole fell 0.74%, 6 times more than Biogen's stock . . . ."); Feinstein Report 131. Similarly, in addition to the statistically significant drop on July 15, Biogen's stock declined relative to these broader markets on June 28, even though this decline was not found statistically significant, and on July 12 itself, the date of the NCD announcement.  Id.

As noted above, the Firefighters also argue that the immediate impact of the July 12 disclosure may have been mitigated somewhat by the presence of some initial positive spin in the press.  Pl.'s Reply 11-12.  The Firefighters have also adduced some evidence suggesting that Biogen's stock might have held relatively steady on July 13 despite the alleged corrective disclosure for a separate reason: the announcement of a world-wide licensing deal for Biogen's drug orelabrutinib, after market close on July 12.  Id. at 16; Block Decl., Ex. B, Biogen July 12, 2021 Press Release.  Similarly, Biogen's own expert report cites analyst and public press commentary voicing concerns over Aduhelm's price and other potential post-approval issues as early as June 8, further supporting the inference that the stock might have dropped further on that date were it not for Biogen's allegedly inflationary misrepresentations. Marietta-Westberg Report ¶¶ 27-30; Pl.'s Reply 13-14 n.5 ("[Biogen] neither isolate[s] the impact of the Medicare

Statements on June 8, 2021 from the myriad news released on that day, nor explain[s] whether Biogen [share price] would not have fallen in line with the pharmaceutical index (or further) absent the misstatements.").

Weighing all direct and indirect evidence of price impact, this Court determined that the demonstrated potential for price inflation on the front end, and for a drop relative to what would have otherwise occurred on the back end, was enough to defeat Biogen's attempt to carry its "daunting" burden to show that the alleged misrepresentations had **no** price impact at all in the class period. Monroe Cnty. Emps.' Ret. Sys. v. Southern Co., 332 F.R.D. 370, 393 (N.D. Ga. 2019) (quoting Aranazu v. Catalyst Pharm. Partners Inc., 302 F.R.D. 657, 673 (S.D. Fla. 2014)). Thus, while this Court determined that the class period could extend no further than the effect of the July 12 disclosure, the "fraud-on-the-market" theory-based presumption of reliance applied to a class period extending up to the time of that disclosure.

### 2. Damages

For reasons similar to those addressed above with respect to predominance, Biogen also contends that the Firefighters have offered no plausible way of calculating class-wide damages, as is their duty under Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013) (requiring that plaintiff translate "the legal theory of

the harmful event into an analysis of the economic impact of that event" (citation omitted)).  Defs.' Mem. Opp'n 17-19.  For their part, the Firefighters contend that they have easily met their burden "simply to propose a methodology for calculating damages that corresponds to [their] theory of liability," as their expert has identified the common "out-of-pocket" methodology for securities fraud, and proposed to determine the difference between stock price inflation when purchased and stock price inflation when sold or when held at the end of the class period.  Luna v. Carbonite, Inc., No. 19-11662-LTS, 2023 WL 4539855, at *10 (D. Mass. July 14, 2023) (Sorokin, J.); Pl.'s Mem. Supp. 18-19; Pl.'s Reply 17-20; Feinstein Report ¶¶ 165 - 177.  Biogen contends that this task is too difficult here because of the multiple possible disclosures and confounding variables, such as the market's assessment of the importance and implications of the NCD process and other developments affecting Aduhelm's commercial viability.  Defs.' Mem. Opp'n 18-19; Defs.' Sur-Reply 8-9.

This Court rules that the Firefighters' proposed methodology is adequate.  On Biogen's theory, it is hard to see how any securities fraud class action could proceed past the certification phase.  See In re Signet Jewelers Ltd. Sec. Litig., No. 16 Civ. 6728(CM)(RWL), 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) ("[T]he Court rejects the suggestion

that an event study is incapable of disaggregating the effects
of confounding information. Were it otherwise, nearly every
securities fraud class action would fail."). Biogen's argument
here is "simply a loss causation argument in disguise, because
it tests the causal relationship between the alleged
misstatements and the price decline." Id. "Since Comcast, many
courts have commented that the potential need for individualized
damages calculations in Section 10(b) cases simply does not
impose a high hurdle on Rule 23(b)(3)'s predominance
requirement." In re Teva Sec. Litig., No. 3:17-cv-558(SRU),
2021 WL 872156, at 41 (D. Conn. Mar. 9, 2021). This is the case
even when defendants are alleged to have lied about multiple
related topics at different times, in "a network of interrelated
lies all collectively aimed at perpetuating a broader, material
lie." Id. (quoting Ontario Tchrs.' Pension Plan Bd. v. Teva
Pharm. Indus. Ltd., 432 F. Supp. 3d 131, 174 (D. Conn. Sept. 25,
2019)). Here, where the Firefighters rely on two nearly
identical misrepresentations made on the same day, the
requirement is more easily satisfied.

## III. CONCLUSION

The requirements of Federal Rule of Civil Procedure 23(a)
are satisfied, and because the Firefighters have shown that the
Basic factors supporting a presumption of reliance apply here,
that Biogen has failed to carry its burden to show no price

impact in the class period, and that the Firefighters have adduced an adequate method of calculating class-wide damages, satisfying Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement, this Court ALLOWED the Firefighters' motion to certify the class.  The alleged misrepresentations were corrected by the disclosure that CMS would engage in an NDC process on July 12, 2021. Thus, this Court certified a class only of those who purchased Biogen stock between June 8, 2021 and July 12, 2021.

Respectfully submitted,

/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE

**ORDER**

The Supreme Court has exhorted the lower courts to resolve class certification issues "early on" in the case management process, see China Agritech v. Resh, 584 U.S. 732, 741 (2018) (citing Fed. R. Civ. P. 23(c)(1)(A)), without delving so far into the merits of the case as implicitly to resolve factual issues that must be left to the jury, see Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds, 568 U.S. 455, 477 (2013)

(recognizing Rule 23(c)(1)(a)'s admonition to certify the class
"[a]t an early practicable time" counsels against determination
of materiality at the class certification stage because it
"would [improperly] necessitate a mini-trial on the issue of
materiality at the class-certification stage").  Although the
most recent amendment to Rule 23(c) provides some "flexibility,"
Danny B. ex rel. Elliott v. Raimondo, 784 F.3d 825, 837 (1st
Cir. 2015) (quoting In re Pharm. Indus. Average Wholesale Price
Litig., 588 F.3d 24, 40 (1st Cir. 2009)), class certification is
nonetheless to proceed expeditiously.

A year passes during which the Firefighters, pointing to
allegedly "new" evidence, try -- and ultimately succeed -- in
getting the Court to amend its judgment and reopen the case on

The alleged fraudulent misstatements at the heart of this
case took place in 2021, nearly four years ago.  The
Firefighters commenced this action on February 7, 2022.  Compl.,
ECF No. 1.  It took a few months to settle on lead counsel, who
filed an amended complaint on June 27 2022.  Am. Compl., ECF No.
30.  The inevitable motion to dismiss, Mot. Dismiss, ECF No. 39,
followed in due course, was heard on October 13 2022, Elec.
Clerk's Notes, ECF No. 49, and decided within six months by a
thorough memorandum and order, Mem. & Order, ECF No. 59,
dismissing this entire case.

A year passes during which the Firefighters, pointing to
allegedly "new" evidence, try -- and ultimately succeed -- in
getting the Court to amend its judgment and reopen the case on

March 19, 2024, Mem. & Order, ECF Nos. 68 and 70.  The Court ordered the case trial-ready by April 1, 2025.  See id.

On May 10 2024, the Firefighters moved to certify the class, ECF No. 79, which motion was duly heard in July, Elec. Clerk's Notes, ECF No. 96, and resulted on September 5, 2024 in the order certifying the class, but modifying the class period. Elec. Order, ECF Nos. 100, 108.

As is their right, all parties sought interlocutory appeal, see Fed. R. Civ. P. 23(f), of this Court's class certification order, which resulted in the Court of Appeals's entering its "show your work" order, to which order the Response above is respectfully made this day.

The Firefighters also moved to file a third amended complaint, ECF No. 121, and filed a motion to amend the class period, ECF No. 123, which motions remain pending.

With the case in its present posture, this Court DENIES the two pending motions, ECF Nos. 121 and 123, without prejudice to their being refiled once the view of the Court of Appeals is made known.  Moreover, the dispositive motions and trial-readiness dates have been overtaken by events and the Court sua sponte extends each of them by nine months such that the case is now to be trial-ready as of January 2, 2026.  The Court will revisit this extension should 1) the Court of Appeals grant an interlocutory appeal, or 2) the motion for leave to file a third

amended complaint is refiled and allowed.

**SO ORDERED.**

 /s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE