UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OKLAHOMA FIREFIGHTERS PENSION  :
AND RETIREMENT SYSTEM,  :
 :
    Plaintiff,  : Civil Action
 : No. 22-10200-WGY
 v.  :
 :
BIOGEN INC., MICHEL VOUNATSOS, and :
ALISHA ALAIMO,  :
 :
    Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
EXCLUDE, IN PART, THE OPINIONS OF PROFESSOR STEVEN P. FEINSTEIN**

James R. Carroll
Michael S. Hines
Maya P. Florence
Yaw A. Anim
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
michael.hines@skadden.com
maya.florence@skadden.com
yaw.anim@skadden.com

*Counsel for Defendants
Biogen Inc., Michel Vounatsos, and
Alisha Alaimo*

Dated: February 2, 2026

**TABLE OF CONTENTS**

                                                                              **PAGE**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

PERTINENT PROCEDURAL AND FACTUAL BACKGROUND...........................................5

    A.    The Court Denied Plaintiff Leave To
          File A Proposed Third Amended Complaint ...........................................................5

    B.    The Feinstein Report Ignores The Allegations
          Of The Operative Complaint And The Class Period ................................................6

    C.    Prof. Feinstein Identifies One Date During The Class Period (June 24,
          2021) Where He Claims Disclosures Related To Alleged Misstatements
          In The PTAC (But Not The Operative Complaint) Caused Investor Losses...........7

    D.    Prof. Feinstein Fails To Establish A Causal Link Between
          Biogen's Stock Price Movement And The Medicare Statements............................8

ARGUMENT....................................................................................................................10

I.    PROF. FEINSTEIN'S OPINIONS
    CONCERNING THE CAUSE OF PUTATIVE LOSSES
    ON JUNE 24, 2021 SHOULD BE EXCLUDED BECAUSE HE FAILS
    TO DISAGGREGATE THE EFFECTS OF CONFOUNDING INFORMATION ..........11

    A.    Prof. Feinstein Makes *No Attempt* To Disaggregate The Effects Of
          Confounding Information Putatively Concerning The Payor Statements .............12

    B.    Prof. Feinstein Does Not Disaggregate Reliably
          The Effects Of The Confounding Eli Lilly Announcement..................................14

II.    PROF. FEINSTEIN SHOULD BE EXCLUDED FROM
    OFFERING OPINIONS CONCERNING THE CAUSE OF PUTATIVE
    LOSSES ON ANY OTHER DATE DURING THE CLASS PERIOD ...........................17

CONCLUSION.................................................................................................................19

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse First Boston*,
   853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) ................ *passim*

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities
   (USA) LLC*,
   752 F.3d 82 (1st Cir. 2014).....................................................................1, 2, 11, 12, 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)......................................................................................................1, 10

*Dura Pharmaceuticals., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................................................1

*Fener v. Belo Corp.*,
   560 F. Supp. 2d 502 (N.D. Tex. 2008), *aff'd*, 579 F.3d 401 (5th Cir. 2009).....................14

*Milward v. Rust-Oleum Corp.*,
   820 F.3d 469 (1st Cir. 2016)..............................................................................................10

*Rodriguez v. Hospital San Cristobal, Inc.*,
   91 F.4th 59 (1st Cir. 2024)..................................................................................................14

*In re Williams Securities Litigation-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ....................................................................................11, 17

*In re Xcelera.com Securities Litigation*,
   No. 00-11649, 2008 WL 7084626 (D. Mass Apr. 25, 2008).............................................14

**STATUTES**

15 U.S.C. §§ 78a.........................................................................................................................5

**RULES**

Fed. R. Evid. 702 ...........................................................................................................1, 2, 10, 14

**REGULATIONS**

17 C.F.R. § 240.10b-5..................................................................................................................5

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants Biogen Inc., Michel Vounatsos, and Alisha Alaimo respectfully move to exclude the opinions of Professor Steven P. Feinstein concerning the cause of any share price decline in Biogen's stock between June 8, 2021 through July 12, 2021.

## PRELIMINARY STATEMENT[1]

Plaintiff alleges that Defendants violated the federal securities laws by making two false and misleading statements on June 8, 2021 regarding potential Medicare coverage for Aduhelm, a treatment for Alzheimer's disease.[2] An essential element of Plaintiff's claim is "loss causation" — *i.e.*, Plaintiff must prove that its putative economic losses were attributable to the disclosure of corrective information concerning the Medicare Statements and not a "tangle of [other] factors" that may have negatively impacted Biogen's stock price. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

The First Circuit has observed that "[t]he usual — it is fair to say the 'preferred' — method of proving loss causation . . . is through an event study" that seeks to "determine[] the extent to which the changes in the price of a security result from events such as disclosure of negative information about a company, and the extent to which those changes result

---

[1] Citations in the form of "Hines Decl. Ex. __" are to the Declaration of Michael S. Hines in Support of Defendants' Motion to Exclude and Motion for Summary Judgment, filed contemporaneously herewith.

[2] The two statements made by Biogen representatives (the "Medicare Statements") are: (1) Mr. Vounatsos: "For Medicare fee-for service, coverage is automatically presumed with FDA approval. We expect most Medicare Advantage plans to define their medical policies within the first several months after launch"; and (2) Ms. Alaimo: "And for Medicare fee-for service, coverage is automatically presumed with FDA approval, and we expect most Medicare Advantage and commercial plans to define their medical policies, which is in reference to your question, within the first several months after launch." (2d Am. Compl., ECF No. 75, ¶¶ 187, 192.)

from other factors." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014) ("*Bricklayers II*").  In other words, a proper event study "must control for confounding factors, *i.e.*, other industry- or company-specific information released to the market unrelated to the alleged fraud." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (Gorton, J.) ("*Bricklayers I*"), *aff'd*, 752 F.3d 82 (1st Cir. 2014).

Here, Plaintiff seeks to establish loss causation solely through an expert report and event study by Prof. Steven P. Feinstein.[3]  Prof. Feinstein's Report is unreliable, however, because it fails to address the putative fraud alleged in the *operative* Second Amended Complaint (ECF No. 75, the "Operative Complaint"), and it fails to set forth a loss causation analysis limited to the Class Period.[4]  Rather, at the direction of Plaintiff's Counsel (Feinstein Report ¶ 5, Hines Decl. Ex. 1), Prof. Feinstein addresses allegations and the putative class period contained in Plaintiff's non-operative, proposed third amended complaint (ECF No. 121-1, the "PTAC").  Because the Feinstein Report is untethered to the allegations of the Operative Complaint, its analyses fail to control for the "tangle of [other] factors" unrelated to Plaintiff's allegations of fraud that Prof. Feinstein himself acknowledges negatively impacted Biogen's stock price during the Class Period.  Accordingly, Prof. Feinstein's proposed opinions concerning the cause of any putative economic loss during the Class Period should be excluded because they are neither "the product of reliable principles and methods" nor "reflect[] a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

---

[3]   Report On Loss Causation And Damages, dated January 21, 2025 (the "Feinstein Report") (Hines Decl. Ex. 1).

[4]   The Court certified a class period of June 8, 2021 through July 12, 2021.  (ECF Nos. 100, 108, 145).

Prof. Feinstein identifies one date during the Class Period — June 24, 2021 — where he claims that Biogen investors suffered losses as a result of certain of Defendants' statements. Prof. Feinstein does not, however, disaggregate the effects of confounding information disclosed on June 24, 2021. His opinions concerning the cause of putative losses on June 24, 2021 should be excluded for two independent reasons.

*First*, Prof. Feinstein does not attempt to establish a causal link between putatively corrective disclosures concerning the Medicare Statements and the decline in Biogen's stock price on June 24, 2021. Specifically, Prof. Feinstein claims that Biogen's stock price decline on June 24, 2021 was caused by, among other things, *both* (1) putatively corrective disclosures concerning the Medicare Statements (which are challenged in the Operative Complaint) *and* (2) putatively corrective disclosures concerning Defendants' statements about discussions with third parties about the pricing of Aduhelm *that are not at issue in the Operative Complaint* (the "Payor Statements"). Prof. Feinstein admitted that he made no effort to differentiate the effects on Biogen's stock price of the Payor Statement disclosures from the effects (if any) of the Medicare Statement disclosures. Prof. Feinstein's failure to remove the confounding effects of disclosures concerning non-operative allegations itself warrants exclusion of his opinions concerning the cause of Biogen's share price decline on June 24, 2021. *See Bricklayers I*, 853 F. Supp. 2d at 190 (holding that an expert analysis "that fails to disaggregate the effects of confounding factors *must be excluded* because it misleadingly suggests to the jury that a sophisticated statistical analysis proves the impact of defendants' alleged fraud on a stock's price when, in fact, the movement could very well have been caused by other information released to the market on the same date") (emphasis added). (*See infra*, Part I.A.)

3

*Second*, Prof. Feinstein's opinions concerning the cause of putative losses on June 24, 2021 should be excluded for the independent reason that he fails reliably to remove the confounding effects of other information disclosed on that day. Before trading opened on June 24, 2021, Eli Lilly announced positive news concerning its competing treatment for Alzheimer's disease. While Prof. Feinstein acknowledges that the Eli Lilly announcement caused a decline in Biogen's stock price on June 24, 2021, and therefore that it must be disaggregated from the share price impact of putatively corrective disclosures concerning the alleged fraud, his method for doing so is unreliable. Specifically, Prof. Feinstein asserts that because in a market analysis Guggenheim reduced its share price target for Biogen stock by $9.00 in the days following the Eli Lilly announcement, the announcement had "at most" a negative $9.00 impact on Biogen's stock price. Prof. Feinstein, however, ignores that Guggenheim's price target reduction was based on *two factors*: (1) the negative Eli Lilly announcement *and* (2) a survey of prescribing neurologists yielding positive information "boding well [for] commercial uptake" of Aduhelm. (Guggenheim Report at 13, Hines Decl. Ex 4.) The Guggenheim report did not place separate values on the potentially positive survey results and the negative Eli Lilly announcement in reaching its price reduction target, and Prof. Feinstein did not place separate values on those factors either.[5] Consequently, Prof. Feinstein's opinions about the price impact of the Eli Lilly

---

[5]    There are myriad possibilities for how Guggenheim valued both the Eli Lilly announcement and the neurologist survey to arrive at its $9.00 price target reduction. For example, perhaps Guggenheim valued the Eli Lilly announcement as negative $30.00 and the neurologist survey as positive $21.00, thereby resulting in a negative $9.00 price target adjustment for Biogen stock. Or perhaps Guggenheim valued the Eli Lilly announcement as negative $20.00 and the neurologist survey as positive $11.00, also resulting in a negative $9.00 price target adjustment. Prof. Feinstein does not say. The only certainty is that Prof. Feinstein's attribution of negative $9.00 to the Eli Lilly announcement is wrong, because it disregards Guggenheim's statement that its $9.00 price target reduction was based on *both* the Eli Lilly announcement *and* the neurologist survey.

4

announcement on Biogen's June 24, 2021 stock price decline are unreliable. (*See infra*, Part I.B.)

Separately, Prof. Feinstein does not identify any other date during the Class Period where he claims disclosure events concerning the Medicare Statements caused investor losses. Accordingly, Plaintiff cannot assert that Biogen investors suffered losses on any date during the Class Period other than June 24, 2021. (*See infra*, Part II.)

## PERTINENT PROCEDURAL AND FACTUAL BACKGROUND

The Operative Second Amended Complaint (ECF No. 75) asserts that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78a et seq.) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by making the Medicare Statements. (2d Am. Compl. ¶¶ 187, 192.) No other statements or theories of liability remain in the case. (*See* ECF Nos. 59, 68.)

### A.    The Court Denied Plaintiff Leave To File A Proposed Third Amended Complaint

On November 13, 2024, Plaintiff filed a motion seeking leave to file a proposed third amended complaint. (ECF No. 121.) In addition to continuing to challenge the Medicare Statements, the proposed third amended complaint (ECF No. 121-1, the "PTAC") sought to include additional statements by Biogen and its representatives as new theories for Plaintiff's securities fraud claims: (i) statements made on June 7 and 8, 2021 concerning discussions with third-party payors (PTAC ¶¶ 97-99, the "Payor Statements") and (ii) statements made on July 22, 2021 concerning Biogen's expectations as to whether Medicare Administrative Contractors and Medicare Advantage plans would provide coverage for Aduhelm treatment during the pendency of a National Coverage Determination analysis (the "MAC and MA Statements") (*id.* ¶¶ 130-

131.)  The Court denied Plaintiff's motion without prejudice on February 4, 2025.  (ECF No. 145 at 40.)

On September 22, 2025, Plaintiff filed a renewed motion for leave to file a "revised" proposed third amended complaint.  (ECF No. 152.)  The allegations asserted in the revised proposed third amended complaint are similar to those asserted in the PTAC, including allegations relating to the Payor Statements and the MAC and MA Statements.  (ECF No. 152-1 ¶¶ 74-76; 118-119.)  While Plaintiff's renewed motion remains pending, the Court stated that "[t]he parties should assume" that the motion will be denied.  (ECF No. 174.)

**B.      The Feinstein Report Ignores The Allegations Of The Operative Complaint And The Class Period**

On January 21, 2025, Plaintiff submitted the Feinstein Report.  Although the Second Amended Complaint was then, and continues to be, the Operative Complaint, at the direction of Plaintiff's Counsel Prof. Feinstein sought to determine whether Biogen investors "suffered losses as a result of the alleged misrepresentations and omissions described in the [PTAC]" and "to quantify damages, if any, suffered by [c]lass members from their investments in Biogen common stock during the period from 7 June 2021 through 8 September 2021" (*i.e.*, a period broader than the Court-certified Class Period of June 8, 2021 through July 12, 2021). (Feinstein Report ¶ 5, Hines Decl. Ex. 1.)  In other words, Prof. Feinstein did not analyze whether Biogen investors suffered losses as a result of the allegations in the Operative Complaint and, if so, whether he could quantify putative damages during the Court-certified Class Period. During his deposition, Prof. Feinstein confirmed that he did not conduct any such analyses because Plaintiff's Counsel instructed him not to analyze the allegations of the Operative Complaint, but rather only the PTAC.  (Feinstein Tr. 51:24-52:4; 60:15-21, Hines Decl. Ex. 3.) Moreover, Prof. Feinstein's Reply Report — submitted *after* the Court *denied* Plaintiff's first

motion to amend — also fails to conduct any analyses based on the allegations in the Operative Complaint and the Court-certified Class Period.  (*See generally* Reply Report, dated February 12, 2025, Hines Decl. Ex. 2.)

### C. Prof. Feinstein Identifies One Date During The Class Period (June 24, 2021) Where He Claims Disclosures Related To Alleged Misstatements In The PTAC (But Not The Operative Complaint) Caused Investor Losses

Prof. Feinstein asserts that he conducted an event study analysis to "investigate[] whether [Biogen's] stock price reacted to the release of new information."  (Feinstein Report ¶ 154, Hines Decl. Ex. 1.)  In his event study, Prof. Feinstein claims to calculate a "residual return" for each trading day — *i.e.*, the change in Biogen's share price on that day which "cannot be attributed to market or sector factors."  (*Id.* ¶ 155.)  According to Prof. Feinstein, if a day's residual return is statistically significant, that "indicates that the residual return cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new, company-specific information."  (*Id.* ¶ 156.)

Prof. Feinstein states that "[t]o be conservative," he limited his loss causation analysis to "disclosure events that prompted statistically significant single-day declines" in Biogen stock.  (*Id.* ¶ 158.)  Prof. Feinstein further states that he analyzed Biogen news and announcements to determine whether disclosures on a particular day constituted "corrective disclosures" — *i.e.*, disclosures that putatively informed the market that alleged misrepresentations and omissions in the PTAC were false or misleading.  (*Id.* ¶ 159.)  Based on this event study analysis, Prof. Feinstein concludes that disclosures on June 24, 2021 "correct[ed certain of] the alleged misrepresentations and omissions" contained in the PTAC.[6]  (*Id.* ¶ 162.)

---

[6]     Prof. Feinstein also concludes that disclosures on July 15, 2021 and September 9, 2021 corrected certain other alleged misrepresentations and omissions contained in the PTAC.

### D.    Prof. Feinstein Fails To Establish A Causal Link Between Biogen's Stock Price Movement And The Medicare Statements

Prof. Feinstein concludes that on June 24, 2021, Biogen stock experienced a statistically significant residual return of -7.23%, or negative $25.93 per share. (Feinstein Report ¶ 177, Hines Decl. Ex. 1.) Prof. Feinstein asserts that the statistically significant residual return in Biogen's stock price on that day "establishes that Company-specific information caused the residual stock price decline." (*Id.* ¶ 178.) According to Prof. Feinstein, five third-party disclosures contributed to Biogen's share price decline on June 24, 2021 (collectively, the "June 24-Related Disclosures"):

1.    After the close of trading on June 23, 2021, *The Boston Globe* reported that the Chief Medical Officer of Point32Health "declared that Biogen should cut Aduhelm's price by a factor of 10, threatened noncoverage of Aduhelm given the $56,000 list price of the drug, and looked to CMS for guidance on coverage for patients on Medicare Advantage." (*Id.* ¶ 162(i).)

2.    After the close of trading on June 23, 2021, *STAT+* "reported that Senators Elizabeth Warren and Bill Cassidy had written a letter to the Senate Finance Committee (the "Warren-Cassidy Letter") asking the Committee to 'take a deeper look at how Biogen's controversial and pricey new Alzheimer's drug, Aduhelm, will affect the Medicare program.'" (*Id.* (citation omitted).)

3.    Before the market opened on June 24, 2021, Eli Lilly announced that "the FDA granted Breakthrough Therapy designation" to its therapy for the treatment of Alzheimer's disease, which would directly compete with Aduhelm. (*Id.* ¶ 197.) Eli Lilly "also stated [its] intention to submit in 2021 a biologics license application for [the competing therapy] under the accelerated approval pathway." (*Id.* (citation omitted).)

4.    During the morning of June 24, 2021, Senator Bill Cassidy published the Warren-Cassidy Letter on his website, "which read in part, 'FDA approval does not guarantee Medicare coverage.'" (*Id.* ¶ 162(i) (citation omitted).)

5.    During trading hours on June 24, 2021, during an interview streamed on *YouTube*, Health and Human Services Secretary Xavier Becerra "stated that coverage of Aduhelm by Medicare and Medicaid was 'an outstanding question,' and decisions

---

(Feinstein Report ¶ 162, Hines Decl. Ex. 1.) Because those dates are not within the Class Period and do not concern allegations in the Operative Complaint, they are irrelevant to this motion.

were yet to be made regarding 'how it's treated, if it will be reimbursed, how much, and so forth.'" (*Id.* (citation omitted).)

In order to establish a causal link between Biogen's stock price movement on June 24, 2021 and the alleged misrepresentations or omissions contained in the PTAC, Prof. Feinstein asserts that he also reviewed the June 24-Related Disclosures for confounding factors — *i.e.*, Biogen news unrelated to the alleged misstatements or omissions in the PTAC. (*Id.* ¶ 191.) According to Prof. Feinstein, based on the content of the June 24-Related Disclosures, the Eli Lilly announcement was unrelated to the PTAC's allegations and therefore constituted confounding information. (*Id.* ¶¶ 196-198.) Prof. Feinstein does not identify any additional confounding information disclosed on June 24, 2021.

Prof. Feinstein next attempts to isolate the causal effect of the Eli Lilly announcement. To do so, Prof. Feinstein relies on a Guggenheim analyst report published on June 29, 2021 (the "Guggenheim Report"). (*See* Hines Decl. Ex. 4.) The Guggenheim Report stated that Guggenheim was lowering its Biogen share price target by $9.00, from $455 to $446 "[f]ollowing the results of [a] survey [of neurologists on physician acceptance of Aduhelm] and the faster-than-expected entrance of competition [from Eli Lilly]." (*Id.*) Prof. Feinstein, however, states that Guggenheim reduced its price target for Biogen stock because of the Eli Lilly announcement only and, as a result, he removes $9.00 from Biogen's June 24, 2021 residual share price decline as attributable to confounding information, concluding that the remaining residual share price decline of $16.93 was attributable to "artificial inflation caused by the alleged misrepresentations and omissions" contained in the PTAC. (Feinstein Report ¶¶ 199, 201, Hines Decl. Ex. 1.) Prof. Feinstein further asserts that the remaining disclosures on June 24, 2021 "undercut [Biogen's] prior representations that i) Aduhelm's price was set after extensive consultation with payors, and ii) Aduhelm's coverage by Medicare could be presumed on the

9

basis of the FDA approval." (*Id.* ¶ 162(i).)  In other words, Prof. Feinstein concludes that the June 24-Related Disclosures caused investor losses because those disclosures putatively corrected *both* the Payor Statements *and* the Medicare Statements.  Prof. Feinstein testified, however, that he made no effort to disaggregate the effects on Biogen's stock price of the Payor Statement disclosures from the effects of the Medicare Statement disclosures.  (Feinstein Tr. 188:2-12, Hines Decl. Ex. 3.)

## **ARGUMENT**

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony.  Rule 702 permits expert testimony if (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods[,]" and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.  In applying Rule 702, the district court serves as the "gatekeeper" for expert testimony by "ensuring that [it] . . . both rests on a reliable foundation and is relevant to the task at hand." *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016) (alteration in original).  As "[t]he party seeking to introduce the evidence," Plaintiff has "the burden of establishing both its reliability and its relevance." *Id.*

The Court "must be vigilant in exercising its gatekeeper role because of the latitude given to expert witnesses to express their opinions . . . and because an expert's testimony may be given substantial weight by the jury." *Bricklayers I*, 853 F. Supp. 2d at 187.  Indeed, "[t]his consideration looms large in securities fraud cases, where complex event studies are often the only evidence used to establish reliance and loss causation." *Id.*

10

The First Circuit's affirmance of the exclusion of expert testimony in *Bricklayers II* is instructive. There, the plaintiffs alleged that research analysts reporting on the merger between AOL and Time Warner withheld relevant information from their reports, thereby inflating the price of AOL's stock. 752 F.3d at 84-85. The plaintiffs offered an event study from an expert witness that sought to establish loss causation of putatively corrective disclosures. *Id.* at 87. The First Circuit affirmed the exclusion of the proposed expert testimony because, among other reasons, the expert's event study failed to "address confounding information that entered the market on the event date." *Id.* at 95; *see also In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1139-43 (10th Cir. 2009) (affirming exclusion of expert opinions due to a "failure to show why the . . . losses should be attributed to the revelation of the fraud and not other non-fraud related news").

Prof. Feinstein's opinions are similarly unreliable and should be excluded because he fails to disaggregate the effects of confounding news from the effects of the putative disclosure of the fraud alleged in the Operative Complaint.

## I. PROF. FEINSTEIN'S OPINIONS CONCERNING THE CAUSE OF PUTATIVE LOSSES ON JUNE 24, 2021 SHOULD BE EXCLUDED BECAUSE HE FAILS TO DISAGGREGATE THE EFFECTS OF CONFOUNDING INFORMATION

Prof. Feinstein's opinions concerning the cause of putative losses on June 24, 2021 should be excluded for two independently sufficient reasons: (a) he makes no attempt to disaggregate the effects of confounding information concerning the Payor Statements from the effects of disclosures concerning the Medicare Statements and, separately (b) he does not disaggregate reliably the effects of the Eli Lilly announcement.

**A.**     **Prof. Feinstein Makes *No Attempt* To Disaggregate The Effects Of Confounding Information Putatively Concerning The Payor Statements**

Prof. Feinstein expressly asserts that the June 24-Related Disclosures contained putatively corrective information about *both* the Payor Statements *and* the Medicare Statements:

> These [disclosures] undercut the Company's prior representations that i) Aduhelm's price was set after extensive consultation with payors [*i.e.*, the Payor Statements], and ii) Aduhelm's coverage by Medicare could be presumed on the basis of the FDA approval [*i.e.*, the Medicare Statements].  The events unfolding on the evening of 23 June 2021 and during the next day undercut the Company's positive representations characterizing how the pricing of Aduhelm would likely be received, [and] how Medicare coverage could be presumed.

(Feinstein Report ¶ 162(i), Hines Decl. Ex. 1.)  Although Prof. Feinstein asserts that those disclosures "caus[ed] Biogen's stock price to decline, thereby causing investors to sustain losses," (*id.* ¶ 10), he does not attempt to disaggregate the effects of confounding information concerning the Payor Statements from the effects of the information concerning the Medicare Statements as alleged in the Operative Complaint.  That failure renders Prof. Feinstein's opinions about the cause of Biogen's share price decline on June 24, 2021 unreliable.  *See Bricklayers II*, 752 F.3d at 95 (affirming Judge Gorton's exclusion of proffered expert testimony and holding that "when conducting an event study, an expert must address confounding information that entered the market on the event date").

*First*, consistent with his Report, Prof. Feinstein testified that the Aduhelm-specific news contained in the June 24-Related Disclosures included negative news about both critiques of Aduhelm's price and Medicare coverage.  For example, Prof. Feinstein testified that *The Boston Globe* article disclosed information concerning critiques of Aduhelm's price that putatively corrected the Payor Statements:

> Q:     [W]hat information is new in this article?
> A:     [T]he controversy has risen to the level where *there is very visceral pushback against the price*.  Point32 said half of their covered customers are commercial payers, and they said they won't cover the therapy if the price isn't reduced. . . .

> [The CMO of Point32] says it's overpriced by 90 percent; that *it would require a 90 percent price reduction to be in a range he thinks is fair*.
>
> . . . .
>
> Q:    Which allegation does [the *Boston Globe* article] relate to?
>
> A:    *Both pricing and coverage.*
>
> Q:    How does it relate to pricing?
>
> A:    *This is clear now that the market is rejecting the pricing.* Major players in the market are rejecting the pricing.

(Feinstein Tr. 124:22-125:18; 131:23-132:4, Hines Decl. Ex. 3 (emphases added); *see also*

*Boston Globe* article, Hines Decl. Ex. 5.)

Similarly, Prof. Feinstein testified that the Warren-Cassidy Letter and the *STAT+*

article reporting on the Warren-Cassidy Letter also disclosed putatively new information

concerning critiques of Aduhelm's price:

> Q:    Anything else in this [Warren-Cassidy] letter that's new?
>
> A:    Well, the level of resistance. The level of – yeah, *resistance – objection to pricing and coverage and reasons supporting that level of objection*.
>
> . . . .
>
> Q:    And another new piece of information you said contained in this [Warren-Cassidy] letter is the level of objection to pricing and coverage?
>
> A:    That's right.
>
> . . . .
>
> Q:    In your view, does [the *STAT+* article] present anything – did it present anything new that was not in Senator Warren and Cassidy's letter?
>
> A:    [T]his article describes the letter as the clearest example yet of Capitol Hill's growing interest in examining the issues created by *the approval of Aduhelm and its price*.

(Feinstein Tr. 137:20-24; 140:6-9; 144:11-19, Hines Decl. Ex. 3 (emphases added); *see also*

Warren-Cassidy Letter and the *STAT+* article, Hines Decl. Exs. 6 and 7, respectively.)

*Second*, Prof. Feinstein conceded that he made *no effort* to disaggregate the

effects of confounding news concerning the Payor Statements on Biogen's share price from the

effects of news concerning the Medicare Statements. (Feinstein Tr. 188:2-12 ("I did not

disaggregate the inflation dissipation by misrepresentation."), Hines Decl. Ex. 3.) Prof.

Feinstein's failure to disaggregate the effects of the confounding news concerning the Payor

13

Statements itself warrants exclusion of his proffered opinions as to the cause of the June 24, 2021 price decline of Biogen stock.  *See Bricklayers I*, 853 F. Supp. 2d at 190 ("An event study that fails to disaggregate the effects of confounding factors must be excluded."); *see also In re Xcelera.com Sec. Litig.*, No. 00-11649, 2008 WL 7084626, at *2 (D. Mass. Apr. 25, 2008) (Zobel, J.) (excluding opinions of expert witness because expert's "analysis fails to take into consideration other factors that affected [company's] stock price"); *Fener v. Belo Corp.*, 560 F. Supp. 2d 502, 505-506 (N.D. Tex. 2008) (holding that plaintiff did not establish loss causation because plaintiff's expert witness "does not even attempt to address" the effects of confounding information), *aff'd*, 579 F.3d 401 (5th Cir. 2009).  In short, Prof. Feinstein's Report does not "reflect[] a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

### B.   Prof. Feinstein Does Not Disaggregate Reliably The Effects Of The Confounding Eli Lilly Announcement

Exclusion of Prof. Feinstein's opinions concerning the cause of the June 24, 2021 share price decline in Biogen stock is also warranted for the independent reason that his method for disaggregating the effects of the Eli Lilly announcement is speculative and incomplete.  *See Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (holding that under Rule 702, an expert's opinion must rest on more than "unsupported speculation" to be admissible) (citation omitted).

Prof. Feinstein acknowledges that Eli Lilly's announcement that the FDA granted Breakthrough Therapy designation for its competing treatment for Alzheimer's disease was confounding information that contributed to the share price decline of Biogen stock on June 24,

14

2021.[7]  (Feinstein Report ¶¶ 196-197, Hines Decl. Ex. 1.)  Prof. Feinstein further acknowledges that the share price impact of the Eli Lilly announcement on Biogen's stock price must therefore be valued and removed from Biogen's residual stock price decline on that day.  (*Id.* ¶ 198; *see also* Feinstein Tr. 160:15-20, Hines Decl. Ex. 3 (testifying that confounding information must be valued "so that the stock price movement can be disaggregated or attributed between . . . [a]llegation-related [and] . . . confounding").)  Prof. Feinstein's only method for valuing the Eli Lilly announcement is reliance on the Guggenheim Report and its $9.00 price target reduction of Biogen stock.  (Feinstein Report ¶¶ 194-201, Hines Decl. Ex. 1.)  According to Prof. Feinstein, Guggenheim reduced its price target for Biogen stock because of the Eli Lilly announcement and therefore he removes $9.00 from Biogen's June 24, 2021 share price decline as attributable to confounding information.  (*Id.* ¶¶ 198-199.)  Prof. Feinstein concludes that the remaining residual share price decline of $16.93 is attributable to "artificial inflation caused by the alleged misrepresentations and omissions" contained in the PTAC.  (*Id.* ¶ 201.)  Prof. Feinstein's reliance on Guggenheim's stock price adjustment to value the Eli Lilly announcement is, however, flawed and unreliable.

    *First*, Prof. Feinstein's attempt to value the effect of the Eli Lilly announcement is premised on his mistaken assertion that "Guggenheim determined that the Eli Lilly competition development had *at most* a negative $9.00 per share impact on Biogen stock."  (*Id.* ¶ 199 (emphases added).)  The Guggenheim Report, however, makes plain that Guggenheim's price target adjustment was based on *two factors*: (1) the negative Eli Lilly announcement *and* (2) the

---

[7]    A Breakthrough Therapy designation is a "process designed to expedite the development and review of drugs that are intended to treat a serious condition and preliminary clinical evidence indicates that the drug may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s)."  *See* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/breakthrough-therapy.

positive results of a survey of prescribing neurologists that "impl[ied] robust and growing awareness for Aduhelm" and "project[ed] rapid uptake of Aduhelm." (Guggenheim Report at 1, Hines Decl. Ex. 4.) As the Guggenheim Report states, "[b]ased on the results of this survey *and* competition for Aduhelm (from [Eli Lilly]) likely entering the market faster than we anticipated . . . we are lowering our [price target] to $446 (from $455)." (*Id.* (emphasis added).) Prof. Feinstein's Report, however, does not discuss the impact of the neurologist survey on Guggenheim's price target adjustment, or the amount by which the survey positively impacted Guggenheim's adjustment.[8] Prof. Feinstein's failure to set forth a method for valuing the impact of the neurologist survey on Guggenheim's price target reduction renders his opinions about the share price impact of the Eli Lilly announcement unreliable. S*ee Bricklayers I*, 853 F. Supp. 2d at 190 ("It would be just as scientific to submit to the jurors evidence of defendants' alleged fraud and [company] stock fluctuations and let them speculate whether the former caused the latter.").

*Second*, Prof. Feinstein acknowledges that the Guggenheim Report "didn't specifically say how [Guggenheim] valued the impact of the survey" (Feinstein Tr. 166:7-9, Hines Decl. Ex. 3), and he further testified that he made no effort to determine how Guggenheim valued the neurologist survey or how that survey impacted Guggenheim's price target adjustment. For example, Prof. Feinstein stated that he "didn't speak to the analyst" and "didn't ask Guggenheim." (*Id.* 168:21; 171:7-8.)

As Judge Gorton noted in *Bricklayers I*, "[f]inancial economists have at their disposal a number of sophisticated methods to isolate the causal effect of different news items

---

[8]    As noted, there are many possibilities for how Guggenheim valued both the Eli Lilly announcement and the neurologist survey to arrive at its $9.00 price target reduction. (*See supra* n.5.)

released on the same day." 853 F. Supp. 2d at 190. Prof. Feinstein testified that "[t]here's numerous ways" to value the effects of confounding information, including (i) a "discounted cash flow valuation analysis on the Eli Lilly news[,]" (ii) "a price earnings analysis," (iii) a "calculat[ion] [of] what impact on valuation-relevant variables might be[,]" or (iv) a "look at what other analysts say was the valuation impact of the news." (Feinstein Tr. 160:21-161:12, Hines Decl. Ex. 3.) But Prof Feinstein did not conduct any independent analysis of the Eli Lilly announcement, relying instead solely on the Guggenheim Report. (*Id.* 162:19-23.)

In short, Prof. Feinstein does not set forth a reliable method for valuing the impact of the Eli Lilly announcement on Biogen's June 24, 2021 stock price decline, rendering his opinions flawed and unreliable. Lacking a reliable method for disaggregating the stock price impact of the Eli Lilly announcement, Prof. Feinstein's opinions as to the cause of Biogen's June 24, 2021 share price decline should be excluded. *See In re Williams*, 558 F.3d at 1142 ("failure to show why the . . . losses should be attributed to the revelation of the fraud and not other non-fraud related news renders [expert's] methodology unreliable").

## II. PROF. FEINSTEIN SHOULD BE EXCLUDED FROM OFFERING OPINIONS CONCERNING THE CAUSE OF PUTATIVE LOSSES ON ANY OTHER DATE DURING THE CLASS PERIOD

Prof Feinstein states that "for the loss causation and damages analyses, [he] focused on disclosure events that prompted statistically significant single-day declines" in Biogen's share price. (Feinstein Report ¶ 158, Hines Decl. Ex. 1.) But Prof. Feinstein does not purport to conduct a loss causation analysis for any date in the Class Period other than June 24, 2021.

*First*, excluding June 24, 2021, Prof. Feinstein's event study identifies three other dates during the Class Period that were associated with statistically significant single-day declines in Biogen's share price — June 11, June 21, and July 9, 2021. (*Id.* at Ex. 8.) Prof.

17

Feinstein does not assert that Biogen investors incurred losses caused by putatively corrective disclosures concerning the Medicare Statements on any of those dates. (*See generally id.* ¶¶ 157-162.) In fact, Prof. Feinstein does not identify any disclosure events on those dates that concern the Medicare Statements at all.[9] Moreover, Prof. Feinstein does not assess potential confounding information released on any of those dates. (*See generally id.*)

Second, although Prof. Feinstein's event study identifies an additional nine days during the Class Period that were associated with single-day declines in Biogen's share price, none of those price declines are statistically significant.[10] Therefore, Prof. Feinstein cannot assert that the negative residual returns on those days were attributable to Biogen-specific news (let alone news concerning the Medicare Statements), rather than to general market conditions. *See Bricklayers II*, 752 F.3d at 86-87 (observing that if a share price decline is statistically significant, "the expert can reject the hypothesis that normal market fluctuations, as opposed to company-specific events, can explain the movement in the share price"). Moreover, Prof. Feinstein does not purport to assess potentially confounding information on any of those dates; indeed, he testified that he did not undertake an assessment to identify and value confounding information on dates where his event study did not find statistically significant share price declines. (Feinstein Tr. 81:8-82:8, Hines Decl. Ex. 3.)

---

[9]    Prof. Feinstein states that after the close of trading on June 10, 2021 *STAT+* "reported that a third member of an FDA expert committee had resigned in response to the FDA's decision to approve Aduhelm," and on July 9, 2021 "FDA Acting Commissioner Janet Woodcock . . . tweeted that she had asked the Office of the Inspector General for the U.S. Department of Health and Services [sic] to conduct an independent review of the process by which Aduhelm was approved." (Feinstein Report ¶¶ 46, 76, Hines Decl. Ex. 1.) Further, Prof. Feinstein does not identify any disclosure event at all that may have impacted Biogen's stock price on June 21, 2021.

[10]    *See* Feinstein Report at Ex. 8, Hines Decl. Ex. 1 (identifying non-statistically significant residual share price declines on June 15, June 16, June 17, June 22, June 25, June 28, July 2, July 6, and July 12, 2021).

18

## CONCLUSION

For the foregoing reasons, Prof. Feinstein's opinions concerning the cause of any share price decline in Biogen's stock between June 8, 2021 through July 12, 2021 should be excluded.

Dated:  February 2, 2026
        Boston, Massachusetts

Respectfully submitted,

/s/ *James R. Carroll*
James R. Carroll (BBO #554426)
Michael S. Hines (BBO #653943)
Maya P. Florence (BBO #661628)
Yaw A. Anim (BBO #569512)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
michael.hines@skadden.com
maya.florence@skadden.com
yaw.anim@skadden.com

*Counsel for Defendants*
*Biogen Inc., Michel Vounatsos, and*
*Alisha Alaimo*

19