UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OKLAHOMA FIREFIGHTERS PENSION    :
AND RETIREMENT SYSTEM,    :
   :
       Plaintiff,    :     Civil Action
   :     No. 22-10200-WGY
     v.    :
   :
BIOGEN INC., MICHEL VOUNATSOS, and   :
ALISHA ALAIMO,    :
   :
       Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

James R. Carroll
Michael S. Hines
Maya P. Florence
Yaw A. Anim
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
michael.hines@skadden.com
maya.florence@skadden.com
yaw.anim@skadden.com

*Counsel for Defendants*
*Biogen Inc., Michel Vounatsos, and*
*Alisha Alaimo*

Dated: February 2, 2026

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

PERTINENT PROCEDURAL BACKGROUND .................................................................. 5

    A.    The Court Dismissed Plaintiff's First Amended Complaint ................................. 5

    B.    The Court Later Allowed Plaintiff To Proceed As To The
        Medicare Statements Only, And Certified A Five-Week Class Period ................... 6

    C.    The Court Denied Plaintiff Leave To
        File A Proposed Third Amended Complaint ........................................................... 7

    D.    Prof. Feinstein Ignores The Allegations Of The Operative
        Complaint And The Court-Certified Class Period, Resulting In An
        Unreliable And Inadmissible Methodology To Assess Loss Causation ................... 8

ARGUMENT ......................................................................................................................... 10

I.    COUNT I:  DEFENDANTS ARE ENTITLED TO SUMMARY
    JUDGMENT BECAUSE PLAINTIFF CANNOT OFFER EVIDENCE
    DISAGGREGATING THE EFFECTS OF CONFOUNDING FACTORS
    FROM THE PUTATIVE DISCLOSURE OF THE ALLEGED FRAUD;
    CONSEQUENTLY, PLAINTIFF CANNOT PROVE LOSS CAUSATION ................... 11

    A.    Prof. Feinstein's Opinions Concerning The Cause Of Putative
        Losses On June 24, 2021 Are Inadmissible Because He Fails To
        Disaggregate The Effects Of Confounding News Released That Same Day ........ 14

    B.    Prof. Feinstein Does Not Identify Or Offer
        An Opinion For Any Other Dates During The Class Period ................................. 18

II.    COUNT II:  DEFENDANTS ARE ENTITLED TO
    SUMMARY JUDGMENT BECAUSE PLAINTIFF'S
    SECTION 20(a) CLAIM IS DERIVATIVE OF ITS SECTION 10(b) CLAIM .............. 20

CONCLUSION ...................................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*ACA Financial Guaranty Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008)................................................................................20

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   477 F. Supp. 3d 88 (S.D.N.Y. 2020), *aff'd*, 2022 WL 151302 (2d Cir. Jan. 18,
   2022) ...............................................................................................................13

*In re Boston Scientific Corp. Securities Litigation*,
   708 F. Supp. 2d 110 (D. Mass. 2010), *aff'd sub nom. Mississippi Public
   Employees' Retirement System v. Boston Scientific Corp.*, 649 F.3d 5
   (1st Cir. 2011) ................................................................................................20

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse First Boston*,
   853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014)...3, 12, 16, 18, 19

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities
   (USA) LLC*,
   752 F.3d 82 (1st Cir. 2014) ..............................................................1, 3, 4, 12, 13

*Dura Pharmaceuticals., Inc. v. Broudo*,
   544 U.S. 336 (2005)..........................................................................2, 11, 12, 14

*Ellis v. Fidelity Management Trust Co.*,
   883 F.3d 1 (1st Cir. 2018)................................................................................11

*Hiam v. HomeAway.com, Inc.*,
   267 F. Supp. 3d 338 (D. Mass. 2017), *aff'd*, 887 F.3d 542 (1st Cir. 2018).......................10

*McGovern ex rel. McGovern v. Brigham & Women's Hospital*,
   584 F. Supp. 2d 418 (D. Mass. 2008) ................................................................10

*Metzler Asset Management GmbH v. Kingsley*,
   928 F.3d 151 (1st Cir. 2019)..............................................................................10

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
   649 F.3d 5 (1st Cir. 2011)................................................................................20

*In re Omnicom Group, Inc. Securities Litigation*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010)................11, 12

*In re PolyMedica Corp. Securities Litigation*,
   432 F.3d 1 (1st Cir. 2005)................................................................................10

*Society of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*,
  754 F. Supp. 2d 219 (D. Mass. 2010), *aff'd*, 689 F.3d 29 (1st Cir. 2012).........................10

*In re Xcelera.com Securities Litigation*,
  No. 00-11649-RWZ, ECF Nos. 334, 339 (D. Mass. May 12, 2008).................................13

*In re Williams Securities Litigation-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ..........................................................................11, 13, 14

**STATUTES**

15 U.S.C § 78a..............................................................................................................1

15 U.S.C § 78t..............................................................................................................20

**RULES**

Fed. R. Civ. P. 56.........................................................................................................10

**REGULATIONS**

17 C.F.R. § 240.10b-5..................................................................................................1

## PRELIMINARY STATEMENT[1]

This securities class action arises out of Biogen's commercial introduction of Aduhelm, a treatment for Alzheimer's disease approved by the Food & Drug Administration ("FDA") on June 7, 2021. Plaintiff's Second Amended Complaint (ECF No. 75, the "Operative Complaint") asserts that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78a et seq.) (the "Exchange Act") and Rule 10b-5 (17 C.F.R. § 240.10b-5) by making two allegedly false and misleading statements on June 8, 2021 regarding the potential scope of Medicare coverage for Aduhelm (the "Medicare Statements").[2]

An essential element of Plaintiff's claim of securities fraud is loss causation (*i.e.*, a causal connection between the alleged misrepresentation and the economic loss). First Circuit precedent is clear that "when proving loss causation in a securities fraud suit, *plaintiffs bear the burden* of showing that their losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) ("*Bricklayers II*") (cleaned up) (emphasis added) (citation omitted). In other words, Plaintiff bears the burden of offering proof that its putative economic losses were actually attributable to Defendants' alleged fraud — here, the Medicare Statements — rather than to "the tangle of other factors" that may

---

[1]   Defendants' Local Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried, filed herewith, is cited as "SMF ¶ __." Citations in the form of "Hines Decl. Ex. __" are to the Declaration of Michael S. Hines in Support of Defendants' Motion to Exclude and Motion for Summary Judgment, filed herewith.

[2]   The Medicare Statements are: (1) Mr. Vounatsos: "For Medicare fee-for service, coverage is automatically presumed with FDA approval. We expect most Medicare Advantage plans to define their medical policies within the first several months after launch" and (2) Ms. Alaimo: "And for Medicare fee-for service, coverage is automatically presumed with FDA approval, and we expect most Medicare Advantage and commercial plans to define their medical policies, which is in reference to your question, within the first several months after launch." (2d. Am. Compl., ECF No. 75, ¶¶ 187, 192.)

have led to a drop in Biogen's stock price during the Class Period,[3] such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Following *Dura*, it is no longer adequate for a plaintiff to simply point out that a company's stock price declined.

Here, Plaintiff's only evidence of loss causation is a report from Prof. Steven P. Feinstein.[4] As detailed in Defendants' contemporaneously filed motion to exclude and accompanying papers,[5] Prof. Feinstein's opinions concerning the cause of any share price decline in Biogen's stock during the Class Period should be excluded because he does not disaggregate the effects of confounding information on Biogen's stock price from the effects of the putative disclosure of the fraud alleged in the Operative Complaint. That is so principally because Prof. Feinstein does not address the allegations in the Operative Complaint or assess loss causation during the Class Period. Rather, Prof. Feinstein ignores the Operative Complaint, and only addresses the allegations and a putative class period asserted in a non-operative, proposed third amended complaint (ECF No. 121-1; the "PTAC") that the Court denied Plaintiff leave to file.[6]

---

[3]    The Court certified a class period of June 8, 2021 through July 12, 2021 (ECF Nos. 100, 108, 145.)

[4]    *See* Report On Loss Causation And Damages, dated January 21, 2025 (the "Feinstein Report") (Hines Decl. Ex. 1). Prof. Feinstein also submitted a Reply Report, dated February 12, 2025 (the "Feinstein Reply Report") (Hines Decl. Ex. 2). The Feinstein Reply Report does not include any additional loss causation analyses not set forth in the Feinstein Report.

[5]    *See* Defendants' Motion To Exclude, In Part, The Opinions Of Professor Steven P. Feinstein, filed contemporaneously herewith. The Memorandum Of Law In Support Of Defendants' Motion To Exclude is referred to and cited as the "Feinstein *Daubert* Brief."

[6]    Plaintiff's motion to amend seeking to file the PTAC (ECF No. 121) was pending at the time Prof. Feinstein submitted his Report on January 21, 2025. Plaintiff's motion was denied without prejudice on February 4, 2025. (ECF No. 145.) Plaintiff filed a second motion to amend on September 22, 2025, seeking to file a "revised" proposed third amended complaint, which

The PTAC sought to add allegations challenging, among other things, statements made on June 7 and June 8, 2021 concerning discussions with third-party payors (the "Payor Statements"). (PTAC ¶¶ 97-99.) Prof. Feinstein's decision to ignore the allegations contained in the Operative Complaint in favor of assessing additional allegations contained in the non-operative PTAC renders Prof. Feinstein's opinions about the cause of any Biogen share price decline during the Class Period unreliable and inadmissible. (*See generally* Feinstein *Daubert* Brief.) Consequently, Plaintiff "cannot show a genuine dispute as to this issue[,]" warranting summary judgment in Defendants' favor. *See Bricklayers II*, 752 F.3d at 97.

*First*, summary judgment is appropriate on Plaintiff's Section 10(b) and Rule 10b-5 claim (Count I). (*See infra* Part I). On June 24, 2021 — the lone date during the Class Period where Prof. Feinstein claims that Biogen investors suffered losses as a result of alleged misstatements — Prof. Feinstein asserts that Biogen's share price declined because of putatively corrective disclosures concerning *both* the Payor Statements *and* the Medicare Statements. But the only allegations of fraud remaining in this case concern the Medicare Statements. Prof. Feinstein did not undertake any analysis to remove the putative effects of disclosures concerning the Payor Statements on Biogen's stock price from the putative effects of disclosures concerning the Medicare Statements. The failure to remove the effects of non-allegation-related information that Prof. Feinstein asserts contributed to Biogen's share price decline on June 24, 2021 is itself a sufficient basis for granting summary judgment. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 194-95 (D. Mass. 2012) (Gorton, J.) ("*Bricklayers I*") (granting summary judgment for the defendants following the exclusion of

remains pending with the Court. (ECF No. 152.) Prof. Feinstein never submitted a supplemental report accounting for the Court's denial of Plaintiff's first motion to amend (which occurred before Prof. Feinstein's submission of the Feinstein Reply Report).

3

expert opinions because, in part, the plaintiffs' proffered expert witness "failed properly to isolate the extent to which the stock price deflation was caused by the disclosures and not by other confounding factors"), *aff'd*, 752 F.3d 82 (1st Cir. 2014).

In addition, summary judgment on Count I is warranted for the independent reason that Prof. Feinstein also fails to disaggregate reliably the effects of other confounding information released on June 24, 2021. Before trading opened on that day, Eli Lilly announced positive news concerning its treatment for Alzheimer's disease. While Prof. Feinstein acknowledges that the Eli Lilly announcement had a negative impact on Biogen's share price on June 24, 2021, and therefore must be disaggregated from the share price impact of putatively corrective disclosures concerning the alleged fraud, his method for doing so is speculative and incomplete. Prof. Feinstein asserts that a market analyst issued a report that reduced its share price target for Biogen stock by $9.00 and therefore, according to Prof. Feinstein, the Eli Lilly announcement had "at most" a negative $9.00 impact on Biogen stock. But that is not supported by the analyst report, which states that the analyst's reduction in its share price target for Biogen stock was based on *two* factors: (1) the Eli Lilly announcement *and* (2) a survey of prescribing neurologists projecting rapid uptake of Aduhelm. The analyst report did not place separate values on the potentially positive survey results and the negative Eli Lilly announcement in reaching its price reduction target, and Prof. Feinstein did not place separate values on those factors either. Prof. Feinstein's failure to value the impact of the neurologist survey on the analyst's price target reduction renders his opinions about the effects of the confounding Eli Lilly announcement on Biogen's June 24, 2021 share price decline unreliable and inadmissible.

4

*Second*, summary judgment is warranted on Plaintiff's Section 20(a) claim (Count II) because without a predicate Exchange Act violation there is no basis to maintain a claim under Section 20(a).  (*See infra* Part II.)

*          *          *

In short, Plaintiff cannot meet its burden of providing evidence to show what part of Biogen's stock price decline during the Class Period was attributable to putatively corrective disclosures concerning the Medicare Statements, if any, and what part was due to other factors. That failure of proof should bring this case to an end.

**PERTINENT PROCEDURAL BACKGROUND**

Plaintiff commenced this action on February 7, 2022 and was appointed Lead Plaintiff on May 10, 2022.  (ECF Nos. 1, 23.)  On June 27, 2022, Plaintiff filed its First Amended Complaint (the "FAC"), asserting claims under Section 10(b) and 20(a) of the Exchange Act (ECF No. 30.)

### A.      The Court Dismissed Plaintiff's First Amended Complaint

The FAC sought to challenge certain of Defendants' statements related to Aduhelm.  Those statements included the two Medicare Statements made by Biogen representatives during a conference call on June 8, 2021.  (*See supra* n.2; *see also* SMF ¶¶ 13-14.)  The FAC also sought to challenge the three Payor Statements made by Biogen representatives on June 7 and June 8, 2021:

> Mr. Vounatsos (during a June 7, 2021 interview with *CNBC*):  "The price is set at $56,000 a year, during the normal year after lengthy engagement obviously this is important with scientific leaders, pharmaco-economists, payers, private and public payers . . . So, we believe this is a fair price."  (SMF ¶ 9.)

5

Mr. Vounatsos (during a June 8, 2021 conference call):  "In determining the price, we engaged with stakeholders, including clinical experts, health economists, policymakers and payers on ADUHELM, and we remain true to Biogen's pricing principles."  (*Id.* ¶ 11.)

Mr. Guindo (during a June 8, 2021 conference call):  "Just to give a bit more background in terms of our thinking, Umer, we've been at this for months, as Michel suggested, we've consulted extensively with experts, health economists, clinicians, policy and payer leaders.  And we have taken also into consideration the Biogen pricing principles . . . So we consider this to be a really responsible price, and we consider this to be a price that is sustainable for the system."  (*Id.* ¶ 12.)

On March 29, 2023, the Court dismissed the FAC, holding that "[u]ltimately fatal to [Plaintiff's] case is the constant misrepresentation of what the Defendants said" and observing that "[a] securities fraud complaint cannot rest on a house of cards made of mischaracterized statements."  (ECF No. 59 at 2-3.)  Among other things, the Court found that Plaintiff "misconstrue[d]" the Payor Statements, holding that "[a]ll that these statements provide is that Biogen engaged with and received input from payors and other relevant stakeholders, ultimately reaching a price that it considered fair."  (*Id.* at 39.)

**B.    The Court Later Allowed Plaintiff To Proceed As To The Medicare Statements Only, And Certified A Five-Week Class Period**

On April 26, 2023, Plaintiff filed a motion to alter or amend the judgment and to file a proposed second amended complaint that included additional allegations based on purportedly newly discovered evidence.  (ECF No. 61.)  The proposed second amended complaint included additional allegations regarding both the Medicare Statements and the Payor Statements.  (*See id.*)  On March 19, 2024, the Court allowed Plaintiff to proceed as to the Medicare Statements only.  (ECF No. 68 at 9-10.)  As to the Payor Statements, the Court again found that Plaintiff "misconstrued [those] statements[,]" holding that "Biogen only stated that it had engaged with stakeholders to receive input in the process of deciding [Aduhelm's] price."

6

(*Id.* at 11.)  The Court also held that Plaintiff's "additional evidence only demonstrates that Biogen had indeed engaged with stakeholders before deciding on a price."  (*Id.*)

On April 10, 2024, Plaintiff filed the Operative Complaint.  Plaintiff did not conform that complaint to remove the Court's rejection of most of Plaintiff's allegations. Accordingly, on May 15, 2024, Defendants filed an unopposed motion to strike many of Plaintiff's allegations, which the Court granted on May 16, 2024.  (ECF Nos. 82-83.)  A version of the Operative Complaint containing highlighting reflecting the stricken allegations is at ECF No. 82-1.

On May 10, 2024, Plaintiff moved to certify a class period from June 8, 2021 through January 11, 2022.  (ECF Nos. 79, 80.)  The Court certified a class period of June 8, 2021 through July 12, 2021 (the "Class Period").  (ECF Nos. 100, 108, 145.)  In terminating the Class Period on July 12, 2021, the Court held that it was "compelled to extend the class period no further than the impact of the July 12 corrective disclosures identified by [Plaintiff], because that is the date on which the alleged misrepresentations [*i.e.*, the Medicare Statements] were unambiguously cured."  (ECF No. 145 at 18.)  On September 25, 2024, both Parties sought Rule 23(f) review of the Court's class certification ruling.  On September 18, 2025, the First Circuit denied each party's Rule 23(f) petition.  (ECF No. 151.)

### C. The Court Denied Plaintiff Leave To File A Proposed Third Amended Complaint

On November 13, 2024, Plaintiff moved for leave to file the PTAC.  (ECF No. 121.)  The PTAC sought to challenge, for a third time, the Payor Statements.  (*Id.*)  The PTAC also sought to challenge statements made on July 22, 2021 concerning Biogen's expectations as to whether Medicare Administrative Contractors and Medicare Advantage plans would provide coverage for Aduhelm treatment during the pendency of a National Coverage Determination

("NCD") analysis (the "MAC and MA Statements"). (*Id.*) The Court denied Plaintiff's motion without prejudice on February 4, 2025, pending a decision by the First Circuit on the Parties' interlocutory appeals of the Court's class certification order (ECF No. 145 at 40), which, as noted, were denied on September 18, 2025.

On September 22, 2025, Plaintiff filed a renewed motion for leave to file a "revised" proposed third amended complaint. (ECF No. 152.) The allegations asserted in the revised proposed third amended complaint were similar to those asserted in the PTAC, including allegations concerning the Payor Statements and the MAC and MA Statements. While Plaintiff's renewed motion remains pending, the Court stated that "[t]he parties should assume" that the motion will be denied. (ECF No. 174.)

**D.      Prof. Feinstein Ignores The Allegations Of The Operative Complaint And The Court-Certified Class Period, Resulting In <u>An Unreliable And Inadmissible Methodology To Assess Loss Causation</u>**

Plaintiff submitted the Feinstein Report on January 21, 2025. Although the Second Amended Complaint was the Operative Complaint, Plaintiff's Counsel instructed Prof. Feinstein to assess the allegations and putative class period of the PTAC. In describing his assignment, Prof. Feinstein states:

> [Plaintiff's Counsel] asked me to determine whether Class members suffered losses as a result of the alleged misrepresentations and omissions *described in the Proposed Third Amended Action Complaint* for Violation of the Federal Securities Laws, dated 13 November 2024 . . . . Counsel also asked me to quantify damages, if any, suffered by Class members from their investments in Biogen common stock during the period from 7 June 2021 through 8 September 2021, inclusive . . . .

(SMF ¶¶ 17-18 (emphasis added).) In other words, Prof. Feinstein did not analyze whether Biogen investors suffered losses as a result of the allegations described in the Operative Complaint and, if so, whether he could quantify putative damages during the Class Period of June 8, 2021 through July 12, 2021. Moreover, Prof. Feinstein's Reply Report — submitted

8

after the Court denied Plaintiff's motion to amend on February 4, 2025 — also fails to set forth any analyses of the allegations in the Operative Complaint. (*See id.* ¶¶ 16, 20.) Although Prof. Feinstein purports to "reserve the right to amend, refine, or supplement [his] analyses . . . including in the event that the Court does not accept the [PTAC]" (*id.* ¶ 21), Prof. Feinstein did not provide any additional analyses in the intervening twelve months since the submission of his reports.

Based on the analysis of the allegations in the PTAC set forth in the Feinstein Report, Prof. Feinstein concludes that disclosures on one date during the Class Period — June 24, 2021 — putatively corrected the alleged misrepresentations and omissions contained in the PTAC. (SMF ¶¶ 36-37.) The Feinstein Report does not identify any other date in the Class Period where disclosures putatively corrected any of Defendants' alleged misrepresentations or omissions, whether asserted in the Operative Complaint or the PTAC, including a disclosure made after the close of trading on July 12, 2021 — the date that the Court held that disclosures "unambiguously cured" the Medicare Statements (ECF No. 145 at 18) — that CMS was commencing an NCD analysis. (*Id.* ¶ 32.) Notably, Prof. Feinstein offers no loss causation analysis for July 13, 2021, the trading day following the CMS disclosure. Moreover, both Prof. Feinstein and Defendants' expert — Dr. Jennifer Marietta-Westberg — concluded that on July 13, 2021, Biogen's stock price did not decline, but *rose*. (*Id.* ¶¶ 33-34.)

As summarized below and detailed in the Feinstein *Daubert* Brief, by exclusively focusing on the allegations of the non-operative PTAC, Prof. Feinstein's loss causation analysis is unreliable and inadmissible because it fails to disaggregate, among other things, the effects of disclosures putatively correcting the Payor Statements on Biogen's share price on June 24, 2021 from the effects, if any, of disclosures putatively correcting the Medicare Statements. (*See*

*generally* Feinstein *Daubert* Brief.)  Accordingly, because Plaintiff cannot submit any evidence of loss causation, summary judgment in Defendants' favor is warranted.

## ARGUMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "If a party resists summary judgment by pointing to a factual dispute on which it bears the burden at trial, that party must point to evidence affirmatively tending to prove the fact in its favor." *Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denv., Colo.*, 754 F. Supp. 2d 219, 223 (D. Mass. 2010) (alteration omitted) (citation omitted), *aff'd*, 689 F.3d 29 (1st Cir. 2012).

To prove a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must establish:  (1) that defendants made a false or misleading statement of material fact in connection with the purchase or sale of a security; (2) that the misrepresentation was made with scienter; (3) reliance (*i.e.*, but for the misrepresentation, an investor would not have purchased or sold the security); (4) economic loss (*i.e.*, the investor lost money as a result of the purchase or sale); and (5) loss causation.  *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6-7 (1st Cir. 2005); s*ee also Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019). Summary judgment in Defendants' favor is appropriate if Plaintiff fails to make a showing sufficient to establish the existence of *any one* of those five elements.  *See McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F. Sup. 2d 418, 426 (D. Mass. 2008) ("Summary judgment is properly entered against a party who 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (citation omitted); *see also Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 351 (D. Mass. 2017) (Young, J.) (granting summary judgment because plaintiff

10

failed "to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] w[ould] bear the burden of proof at trial") (first and second alterations in original) (citation omitted), *aff'd*, 887 F.3d 542 (1st Cir. 2018). In evaluating that proffer, the Court may ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Ellis v. Fidelity Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018) (citation omitted).

I.    **COUNT I:  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT OFFER EVIDENCE DISAGGREGATING THE EFFECTS OF CONFOUNDING FACTORS FROM THE PUTATIVE DISCLOSURE OF THE ALLEGED FRAUD; CONSEQUENTLY, PLAINTIFF CANNOT PROVE LOSS CAUSATION**

Loss causation (*i.e.*, the causal link between the alleged misconduct and the economic harm suffered by investors) is a necessary element of a Section 10(b) claim. *Dura*, 544 U.S. at 346-47. As the Supreme Court held in *Dura*, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* at 342. Rather, a plaintiff must identify a "causal connection" between the loss and the alleged misrepresentation. *Id.* at 347. *Dura* requires that a plaintiff show that it was the revelation of the truth correcting the alleged misrepresentation that caused the loss and not one of the "tangle of factors" that affect a stock's price. *Id.* at 343. Because it is a plaintiff's burden to prove loss causation, failure to offer such proof is grounds for summary judgment. *See, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (granting summary judgment for defendants because "there [was] simply no way for a juror to determine whether the alleged fraud caused any portion of [the p]laintiffs' loss"), *aff'd*, 597 F.3d 501 (2d Cir. 2010). *See also In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (affirming summary judgment for defendants because plaintiffs failed to offer evidence that the declines in stock price were attributable to the alleged fraud).

11

Here, to establish the loss causation element of its Section 10(b) claim, Plaintiff must offer proof that its putative economic losses were actually attributable to Defendants' alleged fraud — *i.e.*, the Medicare Statements. In *Bricklayers I*, Judge Gorton observed that "to survive summary judgment, plaintiffs must isolate the extent to which the decrease in stock price was caused by the disclosure and not, as the Supreme Court has warned, 'the tangle of [other] factors affecting [stock] price.'" 853 F. Supp. 2d at 193 (quoting *Dura*, 544 U.S. at 343) (alterations in original). If Plaintiff cannot offer that proof — and, as summarized below and shown in the Feinstein *Daubert* Brief, it cannot — entry of summary judgment in Defendants' favor is warranted.

For example, in *In re Omnicom*, investors in an advertising and marketing company alleged that the company's transaction with a subsidiary and its accounting for that subsidiary were fraudulent, and alleged that various disclosure events constituted corrections of that putative fraud. 541 F. Supp. 2d at 550, 552. In granting summary judgment in favor of the defendants, the court held that the plaintiffs' expert did "not isolate" the effects of the putative corrective disclosures from that of confounding information released on the same date. *Id.* at 554. The court held that "[b]ecause the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused [the p]laintiffs' loss." *Id.*

The First Circuit in *Bricklayers II* affirmed summary judgment for the defendants on loss causation grounds where the opinions of the plaintiffs' expert were excluded because, in part, that expert failed to disaggregate the effects of confounding information adequately. 752 F.3d at 97. *Bricklayers II* involved allegations that research analysts reporting on the merger between AOL and Time Warner withheld relevant information from their reports, thereby

12

inflating the price of AOL's stock. *Id.* at 84-85. The plaintiffs' expert could not exclude from his analysis the effects that other public reports on that merger may have had on AOL's stock price. *Id.* at 89. The First Circuit therefore affirmed Judge Gorton's exclusion of the plaintiffs' expert and the corresponding grant of summary judgment for the defendants, holding that the plaintiffs "did not show that [the defendants'] statements, as opposed to some other news story, moved the stock price on any given day." *Id.*

The Tenth Circuit reached a similar result in *In re Williams*, on which the First Circuit relied in *Bricklayers II*. 558 F.3d 1130. There, investors alleged that a telecommunications company had misrepresented various facts about a corporate transaction. The Tenth Circuit affirmed the district court's exclusion of the plaintiffs' expert and the grant of summary judgment for the defendants, holding that the plaintiffs "failed to present evidence suggesting that the declines in price were the result of the revelation of the truth" — that is, the truth about the matters putatively misrepresented — "and not some other factor":

> The scenarios that [p]laintiffs offered to explain loss causation failed to identify a causal nexus between the revelation of the previously-concealed truth and the decline in value of [the company's] securities. Because loss causation demands that plaintiffs show that their losses were caused by a revelation of the fraud *and not some non-compensable cause*, these scenarios do not adequately address the issue of loss causation.

*Id.* at 1143 (emphasis added).[7]

Here, Plaintiff bears the burden of isolating the stock price impact of putatively corrective disclosures concerning the Medicare Statements from confounding information that

---

[7]   *See also In re Xcelera.com Sec. Litig.*, No. 00-11649-RWZ, ECF Nos. 334, 339 (D. Mass. May 12, 2008) (Zobel, J.) (granting summary judgment for the defendants following exclusion of the plaintiffs' expert for failing to disaggregate the effects of confounding information); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 111 (S.D.N.Y. 2020) (granting summary judgment for the defendants because "[p]laintiffs fail to disaggregate losses caused by non-fraud factors"), *aff'd*, 2022 WL 151302 (2d Cir. Jan. 18, 2022).

may have contributed to Biogen's stock price declines on dates during the Class Period.  Plaintiff relies solely on Prof. Feinstein's Report to do so.  As detailed in the Feinstein *Daubert* Brief, however, Prof. Feinstein's proffered opinions concerning loss causation during the Class Period are unreliable and therefore inadmissible.  Accordingly, Plaintiff cannot carry its burden to establish loss causation, warranting summary judgment in Defendants' favor.  *See In re Williams*, 558 F.3d at 1143 ("As [p]laintiffs are unable to meet their burden under *Dura Pharmaceuticals* . . . the district court appropriately granted the defendants summary judgment on the issue of loss causation.").

### A.    Prof. Feinstein's Opinions Concerning The Cause Of Putative Losses On June 24, 2021 Are Inadmissible Because He Fails To Disaggregate The Effects Of Confounding News Released That Same Day

Prof. Feinstein identifies only one date during the Class Period where he claims that Biogen investors suffered losses caused by the alleged fraud — June 24, 2021.  (SMF ¶ 39.)  Prof. Feinstein states that on that date, Biogen's stock price experienced a statistically significant residual return of negative $25.93.[8]  (*Id.* ¶ 38.)  According to Prof. Feinstein, the following five third-party disclosures contributed to Biogen's share price decline on that day (collectively, the "June 24-Related Disclosures"):

1.    After the close of trading on June 23, 2021, *The Boston Globe* reported that the Chief Medical Officer of Point32Health "declared that Biogen should cut Aduhelm's price by a factor of 10, threatened noncoverage of Aduhelm given the $56,000 list price of the drug, and looked to CMS for guidance on coverage for patients on Medicare Advantage."  (*Id.* ¶ 41.)

---

[8]    Prof. Feinstein states that a "residual return" is that portion of a company's stock price return on a particular trading day that "cannot be attributed to market or sector factors."  (SMF ¶ 25.)  Prof. Feinstein further states that a "statistically significant stock price reaction in response to the release of new information indicates that the new information caused the change in [stock] price."  (*Id.* ¶ 24.)  Thus, according to Prof. Feinstein, a statistically significant residual return "indicates that the residual return cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new, company-specific information."  (*Id.* ¶ 27.)

2.      After the close of trading on June 23, 2021, *STAT+* "reported that Senators Elizabeth Warren and Bill Cassidy had written a letter to the Senate Finance Committee [(the "Warren-Cassidy Letter")] asking the Committee to 'take a deeper look at how Biogen's controversial and pricey new Alzheimer's drug, Aduhelm, will affect the Medicare program.'" (*Id.* ¶ 42.)

3.      Before the market opened on June 24, 2021, Eli Lilly announced that "the FDA had granted Breakthrough Therapy designation" to its therapy for the treatment of Alzheimer's disease, which would directly compete with Aduhelm. (*Id.* ¶ 43.) Eli Lilly "also stated [its] intention to submit in 2021 a biologics license application for [the competing therapy] under the accelerated approval pathway." (*Id.*)

4.      During the morning of June 24, 2021, Senator Bill Cassidy published the Warren-Cassidy Letter on his website, which "read in part, 'FDA approval does not guarantee Medicare coverage.'" (*Id.* ¶ 44.)

5.      During trading hours on June 24, 2021, during an interview streamed on *YouTube*, Health and Human Services Secretary Xavier Becerra "stated that coverage of Aduhelm by Medicare and Medicaid was 'an outstanding question,' and decisions were yet to be made regarding 'how it's treated, if it will be reimbursed, how much, and so forth.'" (*Id.* ¶ 45.)

Prof. Feinstein opines that the disclosures centered on (1) the *Boston Globe* article, (2) the *STAT+* article, (3) the Warren-Cassidy Letter, and (4) Secretary Becerra's comments, caused Biogen investors to suffer losses because those disclosures putatively corrected Defendants' alleged misstatements and omissions contained in the PTAC concerning the Payor Statements and the Medicare Statements. (SMF ¶ 46.) Prof. Feinstein fails to disaggregate the effects of confounding non-allegation related information on Biogen's stock price decline from the effects, if any, of the putatively corrective disclosures concerning the Medicare Statements as alleged in the Operative Complaint. (*See* Feinstein *Daubert* Brief at 11.) For two separate and independently sufficient reasons, that failure renders Prof. Feinstein's opinions about the cause of Biogen's June 24, 2021 stock price decline inadmissible. (*Id.*)

*First*, because Prof. Feinstein inappropriately conducts his analyses on the allegations of the PTAC (and not the Operative Complaint), he makes no attempt at all to

disaggregate the putative effects of confounding information contained in the June 24-Related

Disclosures concerning the Payor Statements from the putative effects of information disclosed

the same day concerning the Medicare Statements.  (*Id.*)  Prof. Feinstein asserts that the June 24-

Related Disclosures contained putatively corrective information about *both* the Payor Statements

*and* the Medicare Statements:

> These [disclosures] undercut the Company's prior representations that
> i) Aduhelm's price was set after extensive consultation with payors [*i.e.,* the
> Payor Statements], and ii) Aduhelm's coverage by Medicare could be presumed
> on the basis of the FDA approval [*i.e.*, the Medicare Statements].  The events
> unfolding on the evening of 23 June 2021 and during the next day undercut the
> Company's positive representations characterizing how the pricing of Aduhelm
> would likely be received, [and] how Medicare coverage could be presumed.

(SMF ¶¶ 46-47; *see also* Feinstein *Daubert* Brief at 11-12.)  Further, during his

deposition, Prof. Feinstein acknowledged that he made no effort to disaggregate the

effects of information concerning the Payor Statements (which are not part of Plaintiff's

case) from information concerning the Medicare Statements.  (SMF ¶ 48 ("I did not

disaggregate the inflation dissipation by misrepresentation.").)  That failure renders Prof.

Feinstein's proffered opinions about the cause of Biogen's June 24, 2021 share price

decline insufficient and therefore inadmissible (*see* Feinstein *Daubert* Brief at 12),

warranting summary judgment in favor of Defendants.  *See Bricklayers I*, 853 F. Supp.

2d at 190 (excluding expert opinion and granting summary judgment, holding that a

proffered expert opinion that "fails to disaggregate the effects of confounding factors

must be excluded because it misleadingly suggests to the jury that a sophisticated

statistical analysis proves the impact of defendants' alleged fraud on a stock's price

when, in fact, the movement could very well have been caused by other information

released to the market on the same date").

16

*Second*, Prof. Feinstein's opinions about the cause of Biogen's share price decline on June 24, 2021 are inadmissible for the independent reason that he does not disaggregate reliably the effects of the confounding news concerning Eli Lilly. (*See* Feinstein *Daubert* Brief at 11.) Prof. Feinstein acknowledges that the Eli Lilly announcement about its competing treatment for Alzheimer's disease is unrelated to Plaintiff's allegations (*i.e.*, it is confounding news), and therefore it must be valued and removed from Biogen's residual share price decline on June 24, 2021. (SMF ¶¶ 49-53.) Prof. Feinstein's method for valuing the Eli Lilly announcement, however, is limited to reliance on a single analyst report published by Guggenheim on June 29, 2021 (the "Guggenheim Report") in which Guggenheim reduced its price target for Biogen stock by $9.00. (*Id.* ¶¶ 54-56.) According to Prof. Feinstein, Guggenheim reduced its price target for Biogen stock because of the Eli Lilly announcement — and only the Eli Lilly announcement — and he therefore removes $9.00 from Biogen's June 24, 2021 share price decline as attributable to confounding information. (*Id.* ¶¶ 57-58.) Prof. Feinstein concludes that the remaining residual share price decline of $16.93 is attributable to "artificial inflation caused by the alleged misrepresentations and omissions" contained in the PTAC. (*Id.* ¶ 59.)

Prof. Feinstein's reliance on Guggenheim's target price adjustment for Biogen stock to value the Eli Lilly announcement is flawed and unreliable. The Guggenheim Report makes plain that Guggenheim's price target adjustment was not based on the Eli Lilly announcement alone, but rather was premised on *two factors*: (1) the Eli Lilly announcement *and* (2) the results of a survey of prescribing neurologists that "impl[ied] robust and growing awareness for Aduhelm" and "project[ed] rapid uptake of Aduhelm." (SMF ¶¶ 60-64.) As the Guggenheim report states, "[b]ased on the results of this survey *and* competition for Aduhelm

17

(from [Eli Lilly]) likely entering the market faster than we anticipated . . . we are lowering our [price target] to $446 (from $455)." (*Id.* ¶¶ 63, 64 (emphasis added).) The Guggenheim Report did not disaggregate the value of the potentially positive survey results from the value of the negative Eli Lilly announcement in reaching its price target reduction, and Prof. Feinstein did not value those factors separately either.[9] Consequently, Prof. Feinstein's opinions about the price impact of the Eli Lilly announcement on Biogen's June 24, 2021 stock price decline are unreliable. (*See* Feinstein *Daubert* Brief at 16.) *See also Bricklayers I*, 853 F. Supp. 2d at 195 ("partial disaggregation of confounding factors is insufficient to establish that the alleged misrepresentations actually caused [Plaintiff's] loss").

> **B.      Prof. Feinstein Does Not Identify Or Offer
> An Opinion For Any Other Dates During The Class Period**

Prof. Feinstein does not conduct any loss causation analysis for any date in the Class Period other than for June 24, 2021. (*See* Feinstein *Daubert* Brief at 17.) Notably, following the July 12, 2021 CMS disclosure, when the Court ruled that the Medicare Statements were "unambiguously cured" (ECF No. 145 at 18), Prof. Feinstein concluded — as did Defendants' expert, Dr. Marietta-Westberg — that Biogen's stock price *rose*. (SMF ¶¶ 32-34.)

Moreover, although his event study identifies three additional dates in the Class Period with statistically significant single-day residual price declines in Biogen's share price — June 11, June 21, and July 9, 2021 — Prof. Feinstein does not assert that Biogen

---

[9]      There are many possibilities for how Guggenheim valued both the Eli Lilly announcement and the neurologist survey to arrive at its $9.00 price target reduction. For example, Guggenheim might have valued the Eli Lilly announcement as negative $30.00 and the neurologist survey as positive $21.00, thereby resulting in a negative $9.00 price target adjustment for Biogen stock. Or perhaps Guggenheim valued the Eli Lilly announcement as negative $20.00 and the neurologist survey as positive $11.00, also resulting in a negative $9.00 price target adjustment. Neither Guggenheim, nor Prof. Feinstein, separately value the neurologist survey and the Eli Lilly announcement.

investors incurred losses caused by putatively corrective disclosures concerning the Medicare Statements on any of those days.  (*See id.* at ¶ 28.)[10]  Similarly, Prof. Feinstein does not conduct a loss causation analysis for the nine Class Period dates associated with non-statistically significant residual price declines in Biogen's share price.  (*See* Feinstein *Daubert* Brief at 18.)

Because Prof. Feinstein does not offer any opinions of loss causation on any dates other than June 24, 2021 — which, as discussed above, are flawed and unreliable — summary judgment in Defendants' favor should enter.

\*          \*          \*

Plaintiff cannot meet its burden of proving what portion — if any — of Biogen's residual stock price decline from June 8, 2021 through July 12, 2021 was caused by putatively corrective information concerning the Medicare Statements as opposed to other, non-allegation-related factors — *e.g.*, information concerning the Payor Statements, or the Eli Lilly announcement.  That failure of proof is fatal to Plaintiff's Section 10(b) claim.  *See Bricklayers I*, 853 F. Supp. 2d at 195 ("Because plaintiffs have failed to raise a triable issue of fact on the element of loss causation, defendants are entitled to summary judgment.").  So too here; the entry of summary judgment for Defendants on Count I is warranted.

---

[10]     Prof. Feinstein states that after the close of trading on June 10, 2021, *STAT+* "reported that a third member of an FDA expert committee had resigned in response to the FDA's decision to approve Aduhelm," and on July 9, 2021 "FDA Acting Commissioner Janet Woodcock . . . tweeted that she had asked the Office of the Inspector General for the U.S. Department of Health and Services [sic] to conduct an independent review of the process by which Aduhelm was approved."  (SMF ¶¶ 30-31.)  Further, Prof. Feinstein does not identify any disclosure event at all that may have impacted Biogen's stock price on June 21, 2021.  (*Id.* ¶ 36.)

## II.   COUNT II:  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF'S SECTION 20(a) CLAIM IS DERIVATIVE OF ITS SECTION 10(b) CLAIM

Plaintiff's control person claim under Section 20(a) of the Exchange Act (Count II) is entirely derivative of its Section 10(b) claim (Count I).  (*See* 2d Am. Compl., ECF No. 75, ¶¶ 320-321.)  Without a viable primary violation of the Exchange Act, there is no basis to maintain a claim under Section 20(a).  *See* 15 U.S.C. § 78t(a); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008) ("The plain terms of [S]ection 20(a) indicate that it only creates liability derivative of an underlying securities violation.").  Accordingly, if summary judgment is entered in Defendants' favor on Plaintiff's Section 10(b) claim, summary judgment should likewise enter in Defendants' favor on Plaintiff's Section 20(a) claim.  *See In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 129 (D. Mass. 2010) ("Because I have concluded there is no underlying 10b-5 violation, the section 20(a) [claim] must fail.  Consequently, summary judgment will be entered for the [d]efendants as to [the Section 20(a) claim]."), *aff'd sub nom. Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*, 649 F.3d 5, 30 (1st Cir. 2011) ("[T]he district court properly granted [the] defendants' motion for summary judgment on the Section 10(b) and Rule 10b-5 claims.  Because [the] plaintiff's Section 20(a) claim was derivative of the Rule 10b-5 claim, it was properly dismissed as well." (citation omitted)).

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of Defendants dismissing the Second Amended Complaint (ECF No. 75) in its entirety and with prejudice.

Dated:  February 2, 2026
        Boston, Massachusetts

Respectfully submitted,

*/s/ James R. Carroll*
James R. Carroll (BBO #554426)
Michael S. Hines (BBO #653943)
Maya P. Florence (BBO #661628)
Yaw A. Anim (BBO #569512)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
michael.hines@skadden.com
maya.florence@skadden.com
yaw.anim@skadden.com

*Counsel for Defendants*
*Biogen Inc., Michel Vounatsos, and*
*Alisha Alaimo*

21