# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,<br><br>Plaintiff,<br><br>v.<br><br>BIOGEN INC., MICHEL VOUNATSOS, AND ALISHA ALAIMO,<br><br>Defendants. | Civil Action No. 1:22-cv-10200-WGY |

REPLY REPORT

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

February 12, 2025

# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF PRIOR WORK IN THIS MATTER ...............1
II. SCOPE OF THIS REPORT ...............2
III. ANALYSIS AND CONCLUSIONS ...............3
IV. LIMITING FACTORS AND OTHER ASSUMPTIONS ...............12

# I. INTRODUCTION AND SUMMARY OF PRIOR WORK IN THIS MATTER

1. I previously filed three expert reports in this case: an expert report dated 10 May 2024 (the "Feinstein Report"), a reply report dated 18 July 2024 (the "Feinstein Reply Report"), and an expert report dated 21 January 2025 (the "Feinstein Loss Causation and Damages Report"). These three submissions are henceforth referred to collectively as the "Feinstein Reports."[1]

2. As explained in the Feinstein Loss Causation and Damages Report, my most recent report submitted in this case, I determined based on my analysis and the assumption that Lead Plaintiff will prove its factual allegations described in the Proposed Third Amended Action Complaint for Violation of the Federal Securities Laws, dated 13 November 2024 (the "Proposed Third Complaint"), that Class members suffered losses as a result of the alleged misrepresentations and omissions enumerated in the Proposed Third Complaint.[2] I quantified the Section 10(b) damages Class members sustained per share as a result of those alleged misrepresentations and omissions.

3. Specifically, in the Feinstein Loss Causation and Damages Report, I explained:

    i. The corrective disclosures informed investors that a) the Aduhelm launch was beset by problems – problems that the Company was allegedly well aware of at the start of the Class Period but concealed or obscured with the alleged misrepresentations and omissions, and b) the market had been unduly optimistic about the success of the Aduhelm launch as a result of the alleged misrepresentations and omissions.[3]

---

[1] Unless otherwise indicated, capitalized terms used in this report have the meaning ascribed to them in the Feinstein Loss Causation and Damages Report.

[2] Feinstein Damages Report, ¶¶5 and 10-19.

[3] Feinstein Damages Report, ¶12.

ii. Given that Biogen stock traded in an efficient market, it follows that had the adverse facts that were concealed from the public been alternatively timely disclosed, Biogen stock would have been priced significantly lower in the market during the Class Period, and thus would not have been artificially inflated.[4]

iii. Investors who purchased Biogen shares during the Class Period suffered economic losses that were caused by the alleged false and misleading statements and omissions.[5]

iv. Corrective disclosures caused $16.93 of the $25.93 per share residual price decline in Biogen stock on 24 June 2021, and $5.66 of the $16.98 per share residual price decline on 9 September 2021. The stock price declines on both days were statistically significant at above the 99% confidence level.[6]

v. Defendants' misrepresentations and omissions caused the market price of Biogen stock to be artificially inflated by $22.59 per share. The corrective disclosures dissipated this inflation. For each Class member, damages range up to $22.59 per share, depending on the timing of the respective investor's Biogen stock purchase and sale.[7]

## II. SCOPE OF THIS REPORT

4. Block & Leviton LLP, Class Counsel and Counsel for Lead Plaintiff and Class Representative, Oklahoma Firefighters Pension and Retirement System, asked me to consider and evaluate the Expert Report of Jennifer Marietta-Westberg, Ph.D., dated 21 January 2025, submitted on behalf of Defendants in this matter (the "Marietta-Westberg Damages Report").

5. The stated scope of the Marietta-Westberg Damages Report is as follows:

---

[4] Feinstein Damages Report, ¶13.

[5] Feinstein Damages Report, ¶14.

[6] Feinstein Damages Report, ¶¶194-201 and 215-223.

[7] Feinstein Damages Report, ¶¶18-19.

i. Dr. Marietta-Westberg was asked "to opine on whether the economic evidence is consistent with Plaintiff's claim that the June 8, 2021 alleged misrepresentations were value-relevant."[8]

ii. Dr. Marietta-Westberg was also asked "to opine on whether the economic evidence supports Plaintiff's claim that the alleged misrepresentations caused Biogen's stock price to be inflated during the Class Period and the purported correction of the alleged misrepresentations caused Plaintiff to incur losses; and if so, the magnitude of any associated economic damages."[9]

6. This report presents my reply to the Marietta-Westberg Damages Report. To the extent that Defendants submit an expert report containing a financial economic opinion related to the facts and circumstances of the instant matter or in response to the analysis and conclusions presented the Feinstein Loss Causation and Damages Report, or this report, I will respond to those opinions. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

7. I reviewed and relied upon all of the data and documents cited and listed in my previous reports. Additional data and documents considered are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report. Testimony I have provided since the submission of the Feinstein Loss Causation and Damages Report is identified in Exhibit-2 of this report.

## III. ANALYSIS AND CONCLUSIONS

8. The Marietta-Westberg Damages Report provides no basis for revising the analyses and conclusions presented in the Feinstein Loss Causation and Damages Report.

9. My loss causation and damages analyses and opinions are based in part on the assumption that Lead Plaintiff will prove its factual allegations as described in the Proposed Third Complaint. Dr. Marietta-Westberg did not assume the facts as alleged in the Proposed

---

[8] Marietta-Westberg Damages Report, ¶11.

[9] Marietta-Westberg Damages Report, ¶11.

Third Complaint. In fact, she ignored the allegations and recitation of the facts as presented in the Proposed Third Complaint.

10. Throughout her report, Dr. Marietta-Westberg cites to and addresses only Lead Plaintiff's allegations as specified in the Second Class Action Complaint for Violation of the Federal Securities Laws, filed 10 April 2024.[10] Moreover, Dr. Marietta-Westberg states that her understanding of Lead Plaintiff's allegations is derived from Defendants' counsel's instructions to her.[11]

11. As such, the Marietta-Westberg Damages Report does not address the same factual allegations that I addressed in the Feinstein Loss Causation and Damages Report, which analysis compelled my conclusions that "*the alleged misrepresentations and omissions caused the price of Biogen stock to be artificially inflated over the course of the Class Period. When events ultimately informed investors and the public that they had been misled, and provided to them the truth that had previously been concealed by the alleged misrepresentations and omissions, the artificial inflation dissipated, causing the Biogen stock price to decline, thereby causing investors to sustain losses*."[12]

12. Based on my analysis and the assumption that Lead Plaintiff will prove its factual allegations, I estimated that per-share damages range up to $22.59.[13] As Dr. Marietta-Westberg addressed alternative allegations, the Marietta-Westberg Damages Report provides no basis for revising my findings and conclusions on materiality, loss causation, and damages.

13. Dr. Marietta-Westberg does not address Lead Plaintiff's current allegations as described in the Proposed Third Complaint and she ignores several of Lead Plaintiff's public filings that relate to and apparently support the allegations. In addition to her disregarding the Proposed Third Complaint while executing her purported loss causation and damages analysis, Dr. Marietta-Westberg completely ignores i) Lead Plaintiff's Motion to Amend the Complaint in Light of Evidence Produced in Discovery, filed 13 November 2024, ii)

---

[10] Marietta-Westberg Damages Report, ¶8 notes 4, 5, 6, and ¶9 notes 8 and 10.

[11] Marietta-Westberg Damages Report, ¶9 note 8, ¶15, and ¶52.

[12] Feinstein Loss Causation and Damages Report, ¶10 (emphasis added).

[13] Feinstein Loss Causation and Damages Report, ¶19.

Memorandum of Law in Support of Lead Plaintiff's Motion to Amend the Complaint in Light of Evidence Produced in Discovery, filed 13 November 2024, iii) Lead Plaintiff's Motion to Modify the Class Period, filed 13 November 2024, iv) Memorandum of Law in Support of Lead Plaintiff's Motion to Modify the Class Period, filed 13 November 2024, v) Declaration of Jeffrey C. Block in Support of Lead Plaintiff's Motion to Modify the Class Period, filed 13 November 2024, vi) Declaration of Jeffery C. Block in Support of Lead Plaintiff's Motion to Amend the Complaint in Light of Evidence Produced in Discovery, filed 13 November 2024, and vii) Lead Plaintiff's Unopposed Motion for Leave to File Omnibus Reply in Support of Its Motion to Amend the Complaint in Light of Evidence Produced in Discovery and Motion to Modify the Class Period, filed 6 December 2024.

14. The proper role of the financial economics expert when addressing loss causation and damages, which I understand from published authority[14] and from having served as a financial economics expert in over 200 cases, is to assess economic materiality, loss causation, and damages based on the assumption that the plaintiff(s) will prove their case and establish liability. That Dr. Marietta-Westberg does not assess loss causation and damages under the assumption that Lead Plaintiff will prove its factual allegations renders her analysis incomplete and her conclusions inapposite and unhelpful.

15. Of note, I largely agree with Dr. Marietta-Westberg's description of the requisite steps for analyzing loss causation and damages, and I executed those steps in the Feinstein Loss Causation and Damages Report. I agree that, in an efficient market, security prices react promptly to new, economically material information.[15] I examined the efficiency of the market in which Biogen stock traded during the Class Period and concluded that Biogen stock did trade in an efficient market throughout the Class Period.[16] It follows from market efficiency that misrepresentations that were positive in nature, and omissions that concealed negative conditions, would have artificially inflated the Biogen stock price.

[14] *See*, *e.g.*, "Reference Guide on Estimation of Economic Damages," by Mark Allen et al., *Reference Manual on Scientific Evidence*, 3rd Edition, 2011, p. 432 ("In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful").

[15] Marietta-Westberg Damages Report, ¶14a.

[16] Feinstein Report, ¶¶17-20.

Disclosure announcements or events that belie the positive representations and reveal the negative conditions would precipitate losses that were therefore caused by such misrepresentations and omissions.

16. Dr. Marietta-Westberg and I agree that establishing that the subject matter of the alleged misrepresentations, omissions, and corrective disclosures constitutes economically material information is an important step in establishing loss causation and assessing damages.[17] As part of the loss causation analysis in the Feinstein Loss Causation and Damages Report, I examined financial principles, company statements, and commentary by market participants.[18] This examination compels the conclusion that the alleged misrepresentations and omissions caused losses.[19]

17. I further agree that event study analysis can be used to determine whether there was a company-specific stock price reaction on a corrective disclosure date. I agree that to isolate the loss caused by a corrective disclosure, any portion of the residual stock price decline caused by non-allegation-related confounding information should be identified and excluded.[20] In the Feinstein Loss Causation and Damages Report, I explained that I conducted event study analysis and appropriately assessed and excluded the effect of confounding information on the corrective disclosure dates: 24 June 2021, 15 July 2021, and 9 September 2021.[21] Based on my analyses, I concluded that the misrepresentations and omissions caused the price of Biogen stock to be artificially inflated, and that corrective disclosures dissipated that artificial inflation, which caused the Biogen stock price to decline.[22] The alleged misrepresentations and omissions thusly caused investors to suffer losses.[23]

---

[17] Marietta-Westberg Damages Report, ¶¶14 and 18-26.

[18] Feinstein Loss Causation and Damages Report, ¶¶127-150.

[19] Feinstein Loss Causation and Damages Report, ¶¶127-150.

[20] Marietta-Westberg Damages Report, ¶27.

[21] Feinstein Loss Causation and Damages Report, ¶¶151-182 and 194-223.

[22] Feinstein Loss Causation and Damages Report, ¶10.

[23] Feinstein Loss Causation and Damages Report, ¶10.

18. Quantifying damages, I determined that the 23-24 June 2021 corrective disclosures caused Biogen stock to fall $16.93 per share, and the 9 September 2021 corrective disclosure caused the stock to fall an additional $5.66 per share.[24]

19. Dr. Marietta-Westberg's loss causation and damages arguments and conclusions focus solely on a 8 June 2021 alleged misrepresentation and on corrective disclosures occurring only on 28 June 2021 and 12 July 2021. Dr. Marietta-Westberg ignored the full set of Lead Plaintiff's allegations and completely overlooked the corrective disclosures that occurred on 23-24 June 2021 and 9 September 2021. As such, Dr. Marietta-Westberg's incomplete findings and inapposite conclusions have no bearing on my loss causation and damages conclusions. Her arguments and conclusions do not consider Lead Plaintiff's current allegations as described in the Proposed Third Complaint and several other filings with the Court that advance Lead Plaintiff's allegations. Moreover, Dr. Marietta-Westberg admits that her understanding of Lead Plaintiff's allegations was derived, at least in part, from Defendants' counsel's instructions to her.[25] She apparently was asked to conduct incomplete analysis confined by Defendants' counsel's instructions, and by complying, she missed observing how the alleged misrepresentations and omissions inflated the Biogen stock price and ultimately caused investor losses.

20. Dr. Marietta-Westberg's too narrow understanding of Lead Plaintiff's allegations and her confinement of her analysis to too small a set of corrective disclosures are the reasons her incomplete analysis fails to detect the losses caused by the alleged misrepresentations and omissions. Lead Plaintiff alleges misrepresentations and omissions were made on 7 June 2021, 8 June 2021, and 22 July 2021, but Dr. Marietta-Westberg considers only 8 June 2021.

---

[24] Feinstein Loss Causation and Damages Report, ¶15.

[25] Marietta-Westberg Damages Report, ¶9 note 8, ¶15, and ¶52.

21. Lead Plaintiff alleges that a full set of alleged misrepresentations, together with the alleged omissions, deceived investors regarding the prospects for the commercial launch of the Company's Alzheimer's drug Aduhelm.[26] Lead Plaintiff articulates in the Proposed Third Complaint that the full set of misrepresentations and omissions coalesced to induce undue optimism in the market for the Aduhelm launch.

> "Defendants misled investors as to the commercial readiness for its new drug, Aduhelm through three categories of false and misleading statements: (i) statements that Medicare coverage is 'automatically presumed' with FDA approval of a new treatment; (ii) statements that regional Medicare Administrative Contractors (MACs), Medicare Advantage plans, and commercial payers would promptly define their coverage policies for Aduhelm and cover Aduhelm during the pendency of a national coverage analysis by CMS; and (iii) statements that Biogen had engaged with payers on the price for Aduhelm. Defendants' false and misleading statements inflated and maintained inflation in the Company's stock price.
> …
> Taken together, Defendants' misleading statements and omissions of material fact were calculated to convey the sense that Biogen had done the groundwork to ensure that Aduhelm's would be a commercial success following the FDA's approval of the treatment."
> **Proposed Third Complaint, ¶¶4 and 188.**

22. The 23-24 June 2021 disclosures and the 9 September 2021 disclosure corrected the alleged misrepresentations and omissions, informing investors that the Aduhelm launch was beset by problems that had been downplayed by Defendants from the outset.[27] On account of the alleged misrepresentations and omissions, investors had been unduly optimistic about the success of the Aduhelm launch.[28] The corrective information on these dates caused the Biogen stock price to decline and caused investors to sustain damages.

---

[26] Proposed Third Complaint, ¶¶4 and 188; and Feinstein Loss Causation and Damages Report, ¶¶11, 113-126, and 135-136.

[27] Proposed Third Complaint, ¶¶5, 34-35, 41, 139, 143-144, 188-189, 192-194, 197, 203-205, and p. 52; and Feinstein Loss Causation and Damages Report, ¶¶12, 110-126, 162, and 216.

[28] Proposed Third Complaint, ¶¶5, 34-35, 41, 139, 143-144, 188-189, 192-194, 197, 203-205, and p. 52; and Feinstein Loss Causation and Damages Report, ¶¶12, 110-126, 162, and 216.

"The statements, articles, and events identified herein at ¶¶139-172 in Section G, the 'The Market Learned that Aduhelm Was Not Being Readily Prescribed' served as corrective disclosures. As investors digested the partial corrective disclosures, the market began to learn that uncertainty over reimbursement for Aduhelm meant there were no near-term prospects for Aduhelm, that the annual $56,000 price for treatment was an obstacle to access and reimbursement rather than an opportunity for blockbuster revenue, and, ultimately, that Medicare coverage of Aduhelm was not 'automatically presumed with FDA approval.'"
**Proposed Third Complaint, ¶189.**

"[A]fter the close of trading on 23 June 2021, The Boston Globe reported that CMO Sherman of Point32Health declared that Biogen should cut Aduhelm's price by a factor of 10, threatened noncoverage of Aduhelm given the $56,000 list price of the drug, and looked to CMS for guidance on coverage for patients on Medicare Advantage.

• Resistance and criticism grew louder as also after the market close on 23 June 2021, STAT+ reported that Senators Elizabeth Warren and Bill Cassidy had written a letter to the Senate Finance Committee asking the Committee to 'take a deeper look at how Biogen's controversial and pricey new Alzheimer's drug, Aduhelm, will affect the Medicare program.' In the letter, Senators Elizabeth Warren and Bill Cassidy reportedly noted that 'the size of the patient population eligible for Aduhelm, coupled with its high price, could lead to potentially catastrophic impacts on Medicare.' In the morning on 24 June 2021, Senator Bill Cassidy published the letter on his website, which read in part, 'FDA approval does not guarantee Medicare coverage.'
• During trading hours on 24 June 2021, Secretary Becerra stated that coverage of Aduhelm by Medicare and Medicaid was 'an outstanding question,' and decisions were yet to be made regarding 'how it's treated, if it will be reimbursed, how much, and so forth.'
• These comments undercut the Company's prior representations that i) Aduhelm's price was set after extensive consultation with payers, and ii) Aduhelm's coverage by Medicare could be presumed on the basis of the FDA approval. The events unfolding on the evening of 23 June 2021 and during the next day undercut the Company's positive representations characterizing how the pricing of Aduhelm would likely be received, how Medicare coverage could be presumed, and began to inform the market of the much more negative truth that was allegedly known by the Company but concealed from the public. The market began to learn that Aduhelm's launch was in trouble."
**Feinstein Loss Causation and Damages Report, ¶162.i.**

> "On September 9, 2021 investors learned that Aduhelm sales were almost non-existent because providers were waiting for the issue of reimbursement to be resolved before they would prescribe and administer the drug."
> **Proposed Third Complaint, ¶139.**

> "• On 9 September 2021, at the Morgan Stanley Global Healthcare Conference, Biogen admitted that the product launch was disappointing and traced the reasons for the poor performance to the coverage issue. The Company admitted that it had encountered resistance and uncertainty regarding reimbursement, which admission ran contrary to the Company's alleged misrepresentations and omissions made at the time Aduhelm was approved. President Alaimo stated that the 'majority of sites were waiting for clarity on reimbursement.' This impediment to uptake and coverage would persist, according to the Company's disclosure, until the release of an NCD ruling. President Alaimo also cited operational issues, and concerns and questions over clinical data and the approval process.
> • Lead Plaintiff alleges that the slow uptake in Aduhelm's launch was not a surprise to the Company given the Company's prior understanding of the issues addressed. If so, the disappointing launch would not have been surprising to the market if there had been full, honest, and timely disclosure to the public about what the Company knew and had been discussing internally."
> **Feinstein Loss Causation and Damages Report, ¶162.iii.**

> "The Company admitted that the Aduhelm launch was disappointing, essentially a failure relative to what the market had been led to expect. President Alaimo acknowledged that the launch went poorly, acknowledged that it would continue to progress poorly, and enumerated the factors responsible for the poor performance, both past and future. Specifically, the Company admitted that it had encountered resistance and uncertainty regarding reimbursement, which admission ran contrary to the Company's pronouncements at the time Aduhelm was approved, but was consistent with what Lead Plaintiff alleges the Company anticipated from the start. Thus, these revelations were a corrective disclosure."
> **Feinstein Loss Causation and Damages Report, ¶216.**

23. Contrary to Dr. Marietta-Westberg's assessment of zero damages, the facts of the instant matter compel the conclusions that the alleged misrepresentations and omissions did cause the price of Biogen stock to be artificially inflated, that the corrective disclosures dissipated that artificial inflation, and substantial amounts of the resulting Biogen stock price declines represented damages sustained by investors that would not have been suffered but for the

alleged misrepresentations and omissions.[29] As explicated in the Feinstein Loss Causation and Damages Report, after excluding the effects of non-allegation-related confounding information, it is apparent that corrective disclosures caused the Biogen stock price to fall $16.93 per share on 24 June 2021 and $5.66 per share on 9 September 2021.[30] Both of these declines were dissipation of artificial inflation produced or maintained by the alleged misrepresentations and omissions, and thus constitute damages.

24. I reviewed the regression analyses described in the Marietta-Westberg Damages Report, which regression analyses Dr. Marietta-Westberg used to evaluate the statistical significance of her selected misrepresentation date (8 June 2021) and corrective disclosure dates (28 June 2021 and 13 July 2021).[31] For each of her three test dates, Dr. Marietta-Westberg experimented with seven different regression models, each estimated over two alternative data periods.[32] In all, Dr. Marietta-Westberg employed at least 28 unique estimated regressions to test her selected misrepresentation date and corrective disclosure dates.

25. Utilizing Dr. Marietta-Westberg's data and code produced to me pursuant to the filing of the Marietta-Westberg Damages Report, I ran the same seven regression models she employed, each estimated over two alternative data periods (a total of 14 regressions) to test whether the 24 June 2021 corrective disclosure date identified in the Feinstein Loss Causation and Damages Report was statistically significant. All 14 estimated models find that the decline on 24 June 2021 is statistically significant. In fact, using Dr. Marietta-Westberg's data and code, all 14 of the estimated models for 24 June 2021 indicate a higher per-share damage amount than does the regression analysis presented in the Feinstein Loss Causation and Damages Report.

---

[29] Feinstein Loss Causation and Damages Report, ¶¶10-19.

[30] Feinstein Loss Causation and Damages Report, ¶¶194-201 and 215-223.

[31] Marietta-Westberg Damages Report, ¶¶21-29 and Exhibit 2. Of note, Dr. Marietta-Westberg erred when constructing her value-weighted industry indices. The correct method for calculating a value-weighted index return is to multiply the respective return of each constituent stock by that respective stock's index weight as computed prior to the occurrence of the return, not the resulting weight computed after the occurrence of the return. Dr. Marietta-Westberg made the mistake of using the ex-post weight, computed after each return, rather than the ex-ante weight, computed before the return. For the purpose of this analysis, I used the indices as computed by Dr. Marietta-Westberg, but I do not endorse her computations and alternative regression specifications.

[32] Marietta-Westberg Damages Report, ¶¶21-29 and Exhibit 2.

26. In sum, the Marietta-Westberg Damages Report provides no basis for revising the conservative analyses and conclusions presented in the Feinstein Loss Causation and Damages Report. Focusing on an incomplete subset of alleged misrepresentations while disregarding the full set of alleged misrepresentations and omissions, and being directed to consider only two potentially corrective disclosures and ignore others, Dr. Marietta-Westberg's analysis seems to be designed to overlook the loss and damages caused by the alleged fraud. And it did, failing to observe what my more comprehensive analysis detected.

27. That I do not respond to any particular element in the Marietta-Westberg Damages Report should not be misconstrued as tacit acceptance of that particular point. Should Dr. Marietta-Westberg or another expert retained by Defendants submit a report containing a financial economic opinion related to the facts and circumstances of the instant matter or in response to my loss causation and damages analysis, I reserve the right to respond to those opinions.

## IV. LIMITING FACTORS AND OTHER ASSUMPTIONS

28. This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**
**In addition to Those Cited in the Feinstein Reports**

**CASE LEGAL DOCUMENTS**

- Declaration of Jeffery C. Block in Support of Lead Plaintiff's Motion to Amend the Complaint in Light of Evidence Produced in Discovery, filed 13 November 2024.
- Declaration of Jeffrey C. Block in Support of Lead Plaintiff's Motion to Modify the Class Period, filed 13 November 2024.
- Lead Plaintiff's Motion to Amend the Complaint in Light of Evidence Produced in Discovery, filed 13 November 2024.
- Lead Plaintiff's Motion to Modify the Class Period, filed 13 November 2024.
- Memorandum of Law in Support of Lead Plaintiff's Motion to Amend the Complaint in Light of Evidence Produced in Discovery, filed 13 November 2024.
- Memorandum of Law in Support of Lead Plaintiff's Motion to Modify the Class Period, filed 13 November 2024.
- Lead Plaintiff's Unopposed Motion for Leave to File Omnibus Reply in Support of Its Motion to Amend the Complaint in Light of Evidence Produced in Discovery and Motion to Modify the Class Period, filed 6 December 2024.
- Expert Report of Jennifer Marietta-Westberg, Ph.D., dated 21 January 2025.
- Report and Order, filed 4 February 2025.

**OTHER**

- Any other documents cited in the report.

**Exhibit-2**
**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Loss Causation and Damages Report**

In re Exxon Mobil Corporation Securities Litigation
Civil Action No. 3:16-cv-03111-K
United States District Court
Northern District of Texas
Deposition Testimony
January 2025